## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NEW HAMPSHIRE**

**Plaintiff,**

**v.**

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

**Defendant.**

**Case No. 1:26-cv-17**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FREEDOM OF INFORMATION ACT

The American Civil Liberties Union Foundation of New Hampshire ("ACLU-NH" or "Plaintiff") brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, to obtain injunctive and other appropriate relief requiring U.S. Immigration and Customs Enforcement ("ICE" or "Defendant") to release records it has used (or will use) to train approximately 138 officers from 13 local New Hampshire law enforcement agencies that recently entered into agreements with ICE through a program under Section 287(g) of the Immigration and Nationality Act, 8 U.S.C. § 1357(g), to engage in some form of immigration enforcement (hereinafter "the Request"). *See Exhibit A*. The transparency sought here is critical to shedding light on the expanded use of state and local entities as a tool for civil immigration enforcement through this Section 287(g) program. At least four of these 13 local New Hampshire law enforcement agencies—the Troy Police Department, the Colebrook Police Department, the Carroll Police Department, and the Rockingham County Sheriff's Office—have already begun engaging in arrests under this program that has a history of racial profiling. After the recent January 7, 2026

killing of Renee Nicole Good in Minneapolis[1], the public interest in learning about how the police is trained to engage in immigration enforcement is even more important, including here where local police receive less training on immigration enforcement than ICE officers.

## BACKGROUND

1.    Section 287(g) of the Immigration and Nationality Act, enacted in 1996 nearly 30 years ago, authorizes ICE to delegate to state and local law enforcement officers the authority to perform various federal immigration enforcement functions.[2]

2.    The Section 287(g) program uses three models: the Jail Enforcement Model; the Warrant Service Officer Program; and the Task Force Model.  Whereas the first two models allow local law enforcement to perform immigration enforcement only with respect to individuals whom they have already arrested or detained, the Task Force Model affords local law enforcement proactive immigration enforcement authority.  As ICE explains, "[t]he Task Force Model serves as a force multiplier," enabling local law enforcement to conduct immigration enforcement "during their routine police duties."[3]  In a fact sheet, ICE further explains that the Task Force Model "[a]llows your officers to identify and report suspected aliens not charged with crimes (under ICE oversight) and exercise limited immigration authority on ICE-led task forces."  *See Exhibit D* (*287(g)        Benefits*,        U.S.        Immigr.        &        Customs        Enf't, https://www.ice.gov/doclib/about/offices/ero/287g/factsheet287gBenefits.pdf).

3.    In    2011,    a    U.S.    Department    of    Justice    investigation    found    widespread

---

[1] *See* Hannah Ziegler, Alexandra E. Petri, and Christina Morales, *What We Know About the Fatal ICE Shooting in Minneapolis*, N.Y. Times (Jan. 7, 2026), https://www.nytimes.com/2026/01/07/us/ice-shooting-minneapolis-renee-good.html.
[2] *See* U.S. Immigr. & Customs Enf't, *Partner with ICE Through the 287(g) Program*, https://www.ice.gov/287g; 8 U.S.C. § 1357(g).
[3] *See* U.S. Immigr. & Customs Enf't, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, https://www.ice.gov/identify-and-arrest/287g.

discrimination against Latinos in an Arizona county sheriff's office.[4]  The violations led the U.S. Department of Homeland Security ("DHS") to suspend its Section 287(g) agreement with the sheriff's office and restrict that office's access to immigration databases through the Secure Communities program.[5]

4.     One year later, in 2012, the Task Force Model was discontinued altogether.  The Task Force Model then lay abandoned for more than a decade until January 2025.[6]

5.     On January 20, 2025, President Donald J. Trump signed Executive Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443. The Order resurrected the Task Force Model by requiring ICE to use 287(g) agreements "to authorize State and local law enforcement officials . . . to perform the functions of immigration officers . . . ." *Id.* at 8445.

6.     To incentivize local police departments further to participate in the Section 287(g) program, DHS announced the following initiative on September 2, 2025:

Starting October 1, 2025, participating law enforcement will have these reimbursement opportunities:

- ICE will fully reimburse participating agencies for the annual salary and benefits of each eligible trained 287(g) officer, including overtime coverage up to 25% of the officer's annual salary.

---

[4] *See* U.S. Dep't of Just., *Department of Justice Releases Investigative Findings on the Maricopa County Sheriff's Office* (Dec. 15, 2011), https://www.justice.gov/archives/opa/pr/department-justice-releases-investigative-findings-maricopa-county-sheriff-s-office.

[5] *See* Dep't of Homeland Sec., *Statement by Secretary Napolitano on DOJ's Findings of Discriminatory Policing in Maricopa County* (Dec. 15, 2011), https://www.dhs.gov/archive/news/2011/12/15/secretary-napolitano-dojs-findings-discriminatory-policing-maricopa-county.

[6] *See* U.S. Immigr. & Customs Enf't, *FY 2012: ICE Announces Year-End Removal Numbers, Highlights Focus on Key Priorities and Issues New National Detainer Guidance to Further Focus Resources* (Dec. 20, 2012), https://www.ice.gov/news/releases/fy-2012-ice-announces-year-end-removal-numbers-highlights-focus-key-priorities-and ("In addition, ICE has also decided not to renew any of its agreements with state and local law enforcement agencies that operate task forces under the 287(g) program. ICE has concluded that other enforcement programs, including Secure Communities, are a more efficient use of resources for focusing on priority cases."); Ana Ceballos, *What's the 287(g) Task Force Model? Your Guide to the Immigration Enforcement Program*, MIA. HERALD (Mar. 12, 2025), https://www.miamiherald.com/news/local/immigration/article301915479.html ("In 2012, the model was abandoned by the Obama administration after racial profiling issues were discovered and legal challenges emerged. President Donald Trump did not revive the task force model during his first term, but his administration relaunched it last month, and the Florida Highway Patrol was the first law enforcement agency in the country to enroll.").

- Law enforcement agencies will be eligible for quarterly monetary performance awards based on the successful location of illegal aliens provided by ICE and overall assistance to further ICE's mission to Defend the Homeland:

  o 90% - 100% - $1,000 per eligible task force officer
  o 80% - 89% - $750 per eligible task force officer
  o 70% - 79% - $500 per eligible task force officer.[7]

7.    Following the Executive Order, ICE has utilized the once-abandoned Task Force Model in partnerships with over 720 state and local police departments in 34 states.[8]

8.    Since January 2025, 13 New Hampshire law enforcement agencies—four of New Hampshire's ten county sheriff's Offices (Belknap [9], Grafton [10], Hillsborough [11], and

---

[7] See Dep't of Homeland Sec., *DHS Announces New Reimbursement Opportunities for State and Local Law Enforcement Partnering with ICE to Arrest the Worst of the Worst Criminal Illegal Aliens* (Sept. 2, 2025) (emphasis omitted), https://www.dhs.gov/news/2025/09/02/dhs-announces-new-reimbursement-opportunities-state-and-local-law-enforcement.

[8] "As of January 14, 2026 1:52 pm, ICE has signed 1,318 Memorandums of Agreement for 287(g) programs covering 40 states. These include JEM agreements with 147 law enforcement agencies in 31 states, 287(g) WSO agreements with 448 law enforcement agencies in 35 states, and 287(g) TFM agreements with 723 agencies in 34 states." *See* U.S. Immigr. & Custom's Enf't, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*, https://www.ice.gov/identify-and-arrest/287g (last visited Jan. 15, 2025); *see also* Gisela Salomon & Rebecca Santana, *The Revival of an Old Program Delegates Trump Immigration Enforcement to Local Police*, ASSOC. PRESS (May 20, 2025), https://apnews.com/article/287-g-agreements-immigration-law-enforcement-trump-migration-arrests-2a5673cd6c922edd597cb31b532a6b6d; Rafael Carranza, Arizona Luminaria & Gabriel Sandoval, *Local Police Join ICE Deportation Force in Record Numbers Despite Warnings Program Lacks Oversight*, PROPUBLICA (June 9, 2025), https://www.propublica.org/article/ice-deportation-police-287g-program-expansion.

[9] As of October 2, 2025, nine of the Belknap County Sheriff's Office's 37 sworn deputies (nine full time and 28 sworn personnel) will participate in the program.  Part time personnel include bailiffs (court security only), as well as part time deputy sheriffs with full arrest authority.

[10] As of October 30, 2025, one employee within the Grafton County Sheriff's Office (of its sheriff and 14 deputies) will be (or has been) certified to participate in this Section 287(g) program and has completed this training.

[11] As of November 9, 2025, 20 of the Hillsborough County Sheriff's Office's 38 sworn deputies will participate in the program.

Rockingham[12]), eight police departments (Auburn[13], Candia[14], Carroll[15], Colebrook[16], Gorham[17], Ossipee[18], Pittsburg[19], and Troy[20]), and the New Hampshire State Police[21]—have entered into agreements with ICE under the Section 287(g) program employing the Task Force Model. Approximately 138 New Hampshire police officers and sheriff deputies from these 13 law enforcement agencies, including 58 troopers with the New Hampshire State Police, are participating or will participate in this program.

9.      Some of these 13 agencies—including the Troy Police Department, the Colebrook Police Department, the Carroll Police Department, and the Rockingham County Sheriff's Office— have started implementing this program by engaging in immigration arrests as explained in more detail below at Paragraph 35.

10.      These 13 New Hampshire agencies (and their approximately 138 officers that are, or will be, trained under the program) constitute almost all of the local law enforcement agencies

---

[12] As of September 29, 2025, 24 of the Rockingham County Sheriff's Office's 41 deputies will participate in the program.

[13] The Auburn Police Department joined the Section 287(g) program in early January 2026, and the *Boston Globe* reported that the Auburn Police Chief "expects to have about five [of his 20 employees] trained and certified to assist ICE." *See Exhibit U*.

[14] As of September 22, 2025, two of the Candia Police Department's 11 officers (full and part time) will participate in the program.

[15] As of September 18, 2025, four of the Carroll Police Department's eight officers chose to participate in the program.

[16] As of September 16, 2025, five of the Colebrook Police Department's 12 officers (five full time and seven part time) had signed up to participate in the program, though they were not certified yet under the program.

[17] As of September 29, 2025, three of the Gorham Police Department's approximately seven officers will participate in the program. *See Police Department*, GORHAM, NH, https://www.gorhamnh.gov/pages/police-department.

[18] As of September 19, 2025, three of the Ossipee Police Department's six certified officers will participate in the program.

[19] As of September 23, 2025, one of the Pittsburg Police Department's two (full and part time) officers participates in the program.

[20] *See Exhibit H* ("[Troy Police Department Police Chief David Ellis, Jr.] said he and two of his officers have been trained and certified to do immigration enforcement under his department's agreement with ICE.").

[21] As of September 12, 2025, 58 of the State Police's 305 troopers are participating in the program. *See* Steven Porter, *Which Troopers in New Hampshire Will Be ICE-Certified? That Info Is Too Sensitive to Divulge, the State Says*, BOSTON GLOBE (Sept. 12, 2025), https://www.bostonglobe.com/2025/09/12/metro/nh-trooper-names-287g-ice/ ("Fifty-eight troopers with the New Hampshire State Police were recently nominated to participate in federal immigration enforcement efforts under a previously announced agreement with the Trump administration, according to redacted records obtained by The Boston Globe.").

that are formally participating in the Section 287(g) program within the First Circuit jurisdictions

of Maine, New Hampshire, Massachusetts, Rhode Island, and Puerto Rico. Maine[22] and Rhode

Island currently have no local law enforcement agencies participating in the Section 287(g)

program. Undersigned counsel also are not aware of any local police departments in Puerto Rico

that have formally signed Section 287(g) agreements. The only local agency in Massachusetts

participating in the Section 287(g) program is the Massachusetts Department of Corrections, which

employs the more limited Jail Enforcement Model.[23] In other words, New Hampshire law

enforcement are unique in this Circuit in electing to engage in immigration enforcement under this

program.[24]

  11. Deputization under the Section 287(g) program requires training and supervision

by ICE agents. *See* 8 U.S.C. § 1357(g)(2) ("An agreement under this subsection shall require that

an officer or employee of a State or political subdivision of a State performing a function under

the agreement shall have knowledge of, and adhere to, Federal law relating to the function, and

shall contain a written certification that the officers or employees performing the function under

the agreement *have received adequate training regarding the enforcement of relevant Federal*

---

[22] The Wells Police Department in Maine entered into a Section 287(g) agreement in the Spring of 2025. *See* Emma Davis, *First Maine Police Department Joins ICE Partnership*, Maine Morning Star (Apr. 4, 2025), https://mainemorningstar.com/2025/04/04/first-maine-police-department-joins-ice-partnership/. After local feedback, the Town of Wells terminated that agreement in October 2025. *See* Ari Snider, *Wells Police Department Terminates Agreement to Cooperate with ICE*, Maine Public (Oct. 22, 2025), https://www.mainepublic.org/immigration/2025-10-22/wells-police-department-terminates-agreement-to-cooperate-with-ice.

[23] *See* Danny McDonald, Matt Stout, and Laura Crimaldi, *The Department of Correction is the Only Mass. Entity to Have this Pact with ICE. Here's What it Says.*, Boston Globe (Aug. 24, 2025), https://www.bostonglobe.com/2025/08/24/metro/ice-doc-massachusetts-agreement/.

[24] The New Hampshire legislature has gone so far as to recently enact Senate Bill 62, which—effective July 21, 2025—seeks to prevent "any county, municipality, or other political subdivision" from "prohibit[ing] or imped[ing] any … county, or local law enforcement agency from applying for entry or entering into an agreement with the United States Immigration and Customs Enforcement to participate in a federal 287(g) program pursuant to 8 U.S.C. section 1357(g)." *See* RSA 106-P:1. In other words, New Hampshire law now appears to leave the formal decision of whether to enter into a Section 287(g) agreement in the hands of local law enforcement agency heads, with the public bodies that supervise these law enforcement agencies—and that are directly accountable to the electorate—seemingly barred from making binding decisions in preventing the use of local tax dollars to engage in immigration enforcement under the Section 287(g) program.

*immigration laws*.") (emphasis added); *see also* 8 U.S.C. 1357(g)(3), (5); *Arizona v. United States*, 567 U.S. 387, 408-09 (2012) ("In both instances [regarding the issuance of a warrant for a noncitizen's detention], the warrants are executed by federal officers who have received training in the enforcement of immigration law."; further noting that "the agreements reached with the Attorney General must contain written certification that officers have received adequate training to carry out the duties of an immigration officer").

12.     To become authorized by ICE to participate in the Task Force Model, ICE states that local police officers must "complete a 40 hour on-line course covering, among other things, scope of authority, immigration law, civil rights law, cross-cultural issues, liability issues, complaint procedures, and obligations under federal law." *See Exhibit E* (*ERO Facts TFM: 287(g) Task Force Model*, U.S. IMMIGR. & CUSTOMS ENF'T (March 2025), https://www.ice.gov/doclib/about/offices/ero/287g/factsheetTFM.pdf).     ICE also states that participating officers "must be United States citizens, sworn law enforcement officers (LEO), and have at least 2 years LEO experience." *Id.*; *see also Exhibit G* (July 3, 2025 email sent from DHS to the Carroll Police Department on eligibility criteria, and noting that "volunteers, auxiliary [part-time] officers, etc." and officers on "extended leave" are not eligible).

13.     Indeed, the standard Task Force Model Memorandum of Agreement ("MOA") between ICE and local law enforcement—including the MOA signed by the New Hampshire State Police, for example—states that "ICE will provide participating [officers] with the mandatory training tailored to the immigration functions to be performed," which "may be made available to the [Office] in both in-person and online, recorded or virtual-meeting formats . . . . Training will include, among other things: (i) discussion of the terms and limitations of this MOA; (ii) the scope of immigration officer authority; (iii) relevant immigration law; (iv) the ICE Use of Force Policy;

(v) civil rights laws; (vi) the detention of aliens; (vii) public outreach and complaint procedures; (viii) liability issues; (ix) cross-cultural issues; and (x) the obligations under federal law, including applicable treaties or international agreements, to make proper notification upon the arrest or detention of a foreign national." *See Exhibit F*, at p. 4.

14.    On information and belief, the training for some Section 287(g) program models, in general, has been slashed in recent months.  Previously, the Jail Enforcement Model required four weeks of training; that training may now only be five days.  The Warrant Service Officer Model also may have had its training halved from eight to four hours.[25]

15.    The scope of the training under the Task Force Model is less clear, especially where the Task Force Model had been discontinued in 2012 before it was reconstituted in January 2025.

16.    But what we do know is that local police officers participating in this Task Force Model program receive the training through an online portal.  On information and belief, generally no written or electronic training materials are actually provided to the participating officer in a manner such that the officer can possess—and refer back to when the need arises—such materials.

17.    On information and belief, a local officer participating in the Section 287(g) program through the Task Force Model is only granted a 60-day time period to complete the training to receive credentials.  *See also Exhibit G* (July 3, 2025 email sent from DHS to the Carroll Police Department indicating, in part, that once DHS receives a participating officer's information,

---

[25] Nancy Guan, *ICE and All Florida Sheriffs Sign Cooperation Agreements. Now They Await Streamlined Training*, WUSF.org, (Feb. 25, 2025), https://www.wusf.org/courts-law/2025-02-25/ice-florida-sheriffs-cooperation-agreements-await-streamlined-training ("The training time for officers under the program have also been shortened, according to Pinellas County Sheriff Bob Gualtieri, who was also appointed to the State Immigration Enforcement Council.  The Jail Enforcement model required officers to go through a four-week training where they learn how to interrogate suspected non-citizens to determine their immigration status within the jail and then issue the ICE detainers.  That will be condensed into five days.  The Warrant Service Officer Model is more common and trains law enforcement to serve detainer requests, not interrogate suspects. That used to require eight hours of training — but now will only require four.  'The training in the past has been pretty extensive,' said Gualtieri, 'but all of it now is going to get streamlined and we can get this done.'").

that officer will have "60 days to complete" the training.[26]  On information and belief, after the designated time period to view the training, the officer no longer has access to the training.  And even when a participating officer is able to log onto the portal to view the online training during the designated time window, the ability to print or save any of the training information is generally disabled (and, instead, can only be accessed during an active login session during the limited time window provided).

18.     The training local law enforcement agencies receive under the Task Force Model is critically important for the public.  ICE agents receive months of formal training in immigration law and federal policy before they can go out and make arrests.[27]  But local law enforcement in New Hampshire participating in this Section 287(g) program are trained in a more truncated fashion through an online portal without receiving any written materials.

19.     The fact that ICE apparently provided no written materials to any of these 13 New Hampshire law enforcement agencies also raises a fundamental question about the adequacy of this training that (i) is significantly more limited than the training ICE agents receive, and (ii) falls under a program that was hastily rechristened in late-January 2025 after being previously shuttered following racial profiling concerns.  In other words, what good is a training if the officer being trained to ensure that civil liberties are protected does not receive any materials related to the training so that the officer can later refer back to these materials as individual situations arise, and

---

[26] This exhibit omits an attachment identifying certain local officers from the Carroll Police Department who are participating in the Section 287(g) program.

[27] *See* U.S. Immigr. & Customs Enf't, *Career Frequently Asked Questions (FAQs)*, https://www.ice.gov/careers/faqs ("As a new deportation officer you will be required to attend and successfully complete both, a five-week ERO Spanish Language Training Program (DSP) and the 16-week ERO Basic Immigration Law Enforcement Training Program (BIETP) at the Federal Law Enforcement Training Center (FLETC) as well as successfully complete of the Physical Abilities Assessment (PAA) to continue your career as a deportation officer."); *see also* Peter Biello, *The Trump Administration is Hiring More ICE Agents.  What Training Do They Receive?*, NPR (Oct. 29, 2025), https://www.gpb.org/news/2025/10/29/the-trump-administration-hiring-more-ice-agents-what-training-do-they-receive.

so that supervisors (and the public) can ensure that officers are complying with the training that they received?

20.    This apparent practice of compelling local police officers to rely on training from pure memory is a stark departure from "best practices."  For example, the New Hampshire Department of Justice publishes their 555-page Law Enforcement Manual online so that it is available not only to individual officers who have to comply with it, but also to the public so that the public can hold law enforcement accountable.[28]  And lawyers, by analogy, routinely are provided in Continuing Legal Education ("CLE") courses written materials upon which they can rely in future cases.  But, here, ICE apparently takes no such precautions.

21.    The fact that officers trained under the Section 287(g) program receive no tangible materials also prevents the public from accessing the training under state public records laws—with the end result being that the public and law enforcement heads are unable to hold officers accountable to the training received.  To date, the ACLU-NH has been unable to obtain any training materials from almost all of these New Hampshire agencies under New Hampshire's public records law, *see* RSA ch. 91-A, because these agencies do not have (and cannot access) this training.

22.    For these reasons and the reasons below, ICE has unlawfully withheld the requested information without any justification under the FOIA statute.

## JURISDICTION AND VENUE

23.    This Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties under 5 U.S.C. § 552(a)(4)(B), 5 U.S.C. §§ 701-706, and 28 U.S.C. § 1331.

---

[28]    N.H.    Dep't    of    Justice,    *Law    Enforcement    Manual*    (2020    ed.), https://www.doj.nh.gov/sites/g/files/ehbemt721/files/inline-documents/sonh/law-enforcement-manual-2020_0.pdf.

24.     Venue is proper in the District of New Hampshire under 5 U.S.C. § 552(a)(4)(B) because the ACLU-NH's principal place of business is within the District of New Hampshire and because a substantial portion of the requested records relate to immigration enforcement and communications occurring within the District of New Hampshire.  For the same reasons, venue also is proper under 28 U.S.C. § 1391(e).

## PARTIES

25.     Plaintiff ACLU-NH is a non-profit, nonpartisan 26 U.S.C. § 501(c)(3) organization, with its principal place of business in Concord, New Hampshire. The ACLU-NH is a state affiliate of the American Civil Liberties Union, and its mission is to maintain and advance civil rights and civil liberties, as well as to ensure that the government acts in compliance with the Constitution and laws of the United States, with a focus on the state of New Hampshire.  The ACLU-NH is committed to principles of transparency and accountability in government, and seeks to ensure that the public is informed about the conduct of its government in matters that affect civil liberties and human rights.  Obtaining information about governmental activity, analyzing that information, and widely publishing and disseminating it to the press and the public are critical and substantial components of the ACLU-NH's work.

26.     Defendant ICE is a federal agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

**I.      The ACLU-NH's FOIA Request, and the Agency's Response.**

27.     On October 29, 2025, the ACLU-NH submitted the Request to ICE.  *See Exhibit A*.

28.     The Request sought the following data:

1.  Materials currently used by ICE in its instruction courses to train local law enforcement officers from agencies, including NH-based officers and agencies, that signed 287(g) Agreements for all active models of the 287(g) program, as well as materials used during "refresher" trainings for designated immigration officers

from local law enforcement agencies participating in any active models of the program that require such refresher training.

2. Version of materials used by ICE from January 20, 2025 to the present time, in its instruction courses to train local law enforcement officers from agencies, including NH-based officers and agencies, with active 287(g) Agreements for all models of the 287(g) program, as well as materials used during "refresher" trainings for designated immigration officers from local law enforcement agencies participating in any active models of the program that require such refresher training.

*Id.*

29.    On November 24, 2025, ICE responded, denying the ACLU-NH's request for expedited treatment. This response also stated, in part, the following: "Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10-day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B)." *Exhibit B*; *Exhibit C*.

30.    20 business days after the submission of the ACLU-NH's October 29, 2025 Request is November 28, 2025. Ten business days following that date is December 12, 2025. The ACLU-NH recognizes that the federal government was in a shutdown from October 1, 2025 to November 12, 2025, which consisted of at least nine business days in which this FOIA request was pending. Even if nine business days are added to the December 12, 2025 deadline—thereby setting a new deadline of approximately December 30, 2025[29]—no substantive response has been received by this date. *See Exhibit B; see also Exhibit C*.

---

[29] December 24, 2025 and December 26, 2025 are excluded from this "business day" calculation. *See* Proclamation No. 14371, 90 Fed. Reg. 60545 (Dec. 18, 2025); *see also Providing for the Closing of Executive Departments and Agencies of the Federal Government on December 24, 2025, and December 26, 2025*, THE WHITE HOUSE (Dec. 18, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/providing-for-the-closure-of-executive-departments-and-agencies-of-the-federal-government-on-december-24-2025-and-december-26-2025/.

II.     **The Public Interest in Disclosure is Overwhelming.**

31.     The Supreme Court has stated that the FOIA was "enacted to facilitate public access to Government documents" and "designed to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (citation omitted) (internal quotation marks omitted). FOIA's "basic policy of full agency disclosure" furthers the statute's essential purpose of permitting citizens to know "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation omitted) (internal quotation marks omitted); *see also Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45, 50 (1st Cir. 2014) ("FOIA's 'basic policy of full agency disclosure' furthers the statute's essential purpose of permitting citizens to know 'what their government is up to.'") (quoting *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773); *Provenza v. Town of Canaan*, 175 N.H. 121, 131 (2022) ("The public has a substantial interest in information about what its government is up to . . .").

32.     Here, the public interest in disclosure is overwhelming, as these training records concern how 13 New Hampshire law enforcement agencies—including New Hampshire's largest police force, the State Police—will use its law enforcement authority to enforce a federal immigration program that was previously suspended following racial profiling concerns being raised.

33.     Indeed, because Section 287(g) agreements allow local law enforcement agencies to carry out certain federal immigration operations, even the most minor interactions with local law enforcement can lead to detention, deportation, and family separation.  These interactions, in turn, can erode trust in law enforcement and lead to civil rights violations.  Over the years, many

13

agencies have chosen to end their 287(g) agreements for precisely these reasons.[30]  The Manchester Police Department[31], along with others throughout New Hampshire, have recently declined to engage in immigration enforcement under this program that detracts from their ability to focus on, and respond to, local needs.

34.     Despite the Task Force Model's well-documented harms, 13 New Hampshire law enforcement agencies recently have entered into Section 287(g) Task Force Model agreements.[32] At least four of these 13 agencies—the Troy Police Department, the Colebrook Police Department, the Carroll Police Department, and the Rockingham County Sheriff's Office—have started implementing this program in engaging in immigration arrests.  The requested training records also would help the public evaluate how these 13 law enforcement agencies manage their limited law enforcement resources. Without disclosure, the taxpayers funding these 13 New Hampshire agencies will never know if and how these local officers participating in the Task Force Model are receiving adequate training to ensure that civil liberties are protected.

35.     Recent incidents of enforcement under this Section 287(g) program include the following:

- **Troy Police Department:** The Troy Police Department has engaged in 12 immigration arrests from September 23, 2025 to November 13, 2025 under this program.  *See Exhibit H*; *Exhibit K*.  Ten of these (eight drivers and two passengers) involved people residing outside New Hampshire (i) who are listed as Hispanic and/or have names derived from the Spanish or Portuguese languages, (ii) who were in vehicles where, based on the available reports, there is no indication that they were registered in New Hampshire, and (iii) who were initially in vehicles stopped for speeding or some other motor vehicle violation.  *See*

---

[30] *See* Anneliese Hermann, *287(g) Agreements Harm Individuals, Families, and Communities, But They Aren't Always Permanent*, CTR. FOR AM. PROGRESS (Apr. 4, 2018), https://ampr.gs/2KKRKk6.

[31] Imani Fleming, *Manchester Police Department Will Not Join Federal 287(g) Partnership Program With ICE*, WMUR (Mar. 7, 2025), https://www.wmur.com/article/manchester-police-department-federal-287-program/64079872.

[32] Until 2025, no known law enforcement agency in New Hampshire was participating in the 287(g) program.  *See* Lau Guzmán, *More NH Law Enforcement Agencies Agree to Participate in Federal Immigration Efforts*, USA TODAY (Mar. 13, 2025), https://www.usatoday.com/story/news/2025/03/13/nh-law-enforcement-agencies-agree-to-partner-with-ice/82308491007/.

_Exhibit K_.  Of the eight drivers detained, seven had valid driver's licenses from Massachusetts that are (i) not used for federal purposes, (ii) are universally available regardless of citizenship status, and (iii) do not indicate citizenship status on the face of the license.  _See Exhibit K_.  Significantly, Troy "is a primary route for people traveling between Boston and Keene and has a speed limit of 55 mph in some places, which drops to 30 mph in Troy."  _Exhibit H_.

Nine of these ten detentions happened during full daylight hours after sunrise or within 18 minutes of full sunrise.  _See Exhibit K_, at TROY007-8 (noting October 6, 2025 stop at 6:33 a.m., 18 minutes before 6:51 a.m. sunrise).  One occurred around two hours after full sunset. _Id._, at TROY015-17.  In all ten cases, it appears that the Troy Police Department did not actually cite anyone for the commission of a crime or motor vehicle violation.  And for at least eight of these ten immigration detentions, there is no indication that any crime was committed.  _Exhibit K_, at TROY015-17 (indicating prior crimes alleged); _id._, at TROY001-02 (report containing no indication that the driver had a valid license).

In one of these ten cases according to the _Boston Globe_ and _Keene Sentinel_, the Troy Police Department police chief arrested on Monday, October 6, 2025 at around 3:40 p.m. a 23-year-old man from Brazil with work authorization in the United States who was on his way home to Lowell after that Department stopped the vehicle in which he was a passenger, allegedly for speeding.  _See Exhibit I_; _see also Exhibit H_; _Exhibit K_, at TROY009-12.  As the _Globe_ reported, the passenger "identified himself during the traffic stop and produced a work authorization card valid for two more years, according to court filings. The officer took him into custody at the behest of Immigration and Customs Enforcement.  He spent the next month behind bars, without any criminal charges" until he filed a successful habeas petition before the U.S. District Court (McCafferty, C.J.) and was then released following a bond hearing before an Immigration Judge.  _See Exhibit I_; _Exhibit H_; _see also Exhibit L_ (court materials); _Exhibit K_, at TROY010, 12.  It appears that the Troy Police Department chief initially suspected that the passenger could be undocumented because—after the driver was detained and the chief asked the passenger if he had a driver's license so the passenger could drive the vehicle—the passenger gave the chief this work authorization card and stated that he did not have a driver's license (though he was not driving).  _See Exhibit K_, at TROY010, 12.  The _Globe_ added: "[The man] has been undergoing a yearslong process to secure lawful permanent residency. He was designated during the Biden administration as a special immigrant juvenile [SIJ], which offers some relief for young undocumented immigrants who were abused, neglected, or abandoned by their parents. He was also granted deferred action, which was supposed to provide some security while he awaits his turn to apply for a green card."  _See Exhibit I_; _see also Exhibit H_.

In another one of these ten detentions, on Monday, October 6, 2025 at around 6:33 a.m., the Troy Police Department police chief stopped a vehicle for travelling the speed limit of 55 miles per hour, but then "all of a sudden" putting on the brakes and slowing down to 45 miles per hour, which was lower than the speed limit.  _See Exhibit K_, at TROY007-8

(stating that "there was nothing in front of him to warrant slowing down to that speed").  It is unclear what motor vehicle offense this driver committed.[33]

And in another one of these ten detentions, a 26-year-old man was arrested on Tuesday, October 7, 2025 at around 7:05 a.m. after initially being stopped for speeding and crossing the white fog line several times.  He then spent 15 days in ICE custody in Strafford County jail in Dover.  *See Exhibit J*; *see also Exhibit K*, at TROY013-14.  After the filing of a habeas petition on October 8, 2025, the U.S. District Court (McCafferty, C.J.) ruled on October 14, 2025 that the man's "present detention without a bond hearing violates" the federal Immigration and Nationality Act.  The Court ordered that an immigration judge hold a bond hearing within seven days.  The man posted a $4,500 bond, and he was released on Oct. 22, 2025.  *See Exhibit J*; *see also Exhibit M* (docket for *Juan Carolos Malan Quizhpi v. U.S. Immigration and Customs Enforcement*, No. 1:25-cv-00389-LM-AJ).  The man had a two-month-old baby and a young daughter.  *See Exhibit J*.

Finally, these 12 immigration arrests include two arrests outside of Troy's jurisdiction at the Keene District Courthouse where two individuals were appearing for arraignments in pending cases.  *See Exhibit H*; *see also Exhibit K*, at TROY021-22, 25-27.  This occurred despite the fact that Section I of the Section 287(g) agreement limits enforcement to "within the LEA's jurisdiction."  *See Exhibit F*, at p. 1.[34]

- **Colebrook Police Department**: The Colebrook Police Department engaged in one immigration arrest on the evening of Tuesday, November 25, 2025, after one of the Department's officers saw "a white van pass [the officer] heading south while [the officer] was driving north" that allegedly had "damage to the front bumper and no front license plate."  *See Exhibit N*.  The report adds that the officer "could not make out the rear license plate."[35]  After observing the van, the officer, at around 6:43 p.m. (sunset was around 4:09

---

[33] RSA 265:64, I states, in part, that "[n]o person shall drive a vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law."  However, nothing in the report meaningfully indicates that the reduction in speed here "impede[d] the normal and reasonable movement of traffic," nor does the report indicate the road and weather conditions at the time.  Further, RSA 265:46, I states that "[a]ny stop or turn signal when required herein shall be given either by means of the hand and arm or by lighted signal lamps, except as otherwise provided in paragraph II."  RSA 265:45, III also states that "[n]o person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal."  Under these two latter provisions, there is no indication in the report that the reduction in speed was not signaled through brake lights; to the contrary, the report states that the man "continued at 45 with his brake lights on."

[34] On April 27, 2021, DHS announced guidance to limit ICE civil enforcement actions in or near courthouses.  *See* Dep't of Homeland Sec., *DHS Announces New Guidance to Limit ICE and CBP Civil Enforcement Actions In or Near Courthouse* (Apr. 27, 2021), https://www.dhs.gov/archive/news/2021/04/27/dhs-announces-new-guidance-limit-ice-and-cbp-civil-enforcement-actions-or-near.  This guidance was rescinded on January 21, 2025.  *See* Memorandum from the Acting Director of U.S. Immigration & Customs Enf't on Civil Immigration Enforcement Actions in or near Courthouses to all ICE employees (Jan. 21, 2025), (https://www.ice.gov/doclib/foia/policy/11072.3_CivilImmEnfActionsCourthouses_01.21.2025.pdf.

[35] The vehicle was registered in Florida, and Florida law generally does not require front license plates on most passenger cars.  *See* Fla. Stat. Ann. § 316.605(1); Fla. Stat. Ann. § 320.06(1)(a); Fla. Stat. Ann. § 316.221.  In New Hampshire, two license plates must be displayed.  *See* N.H. Div. of Motor Vehicles, *Vehicle Registration Frequently*

p.m.), turned around and caught up with the van.  The officer then engaged in a motor vehicle stop after allegedly seeing (i) the state name on the rear license plate (which was Florida) obscured by a thick, black license plate frame in violation of RSA 261:176 (though the peach design reflecting that it was a Florida plate could be seen), and (ii) the van "fail[ing] to make a complete stop at [a] stop sign" before turning left.  In other words, it appears that the officer turned around and decided to catch up to, and follow, the van *before* observing these two alleged motor vehicle violations that triggered the stop.

The man driving the van was from Bolivia and presented an apparently-valid New York driver's license marked "Not for Federal Identification."[36]  The officer's inquiry during the stop, based on the police report, appears to have focused on immigration status.  Indeed, despite the driver's use of an apparently-valid driver's license that New York citizens also are eligible to possess, the officer suspected that the man was undocumented because of this license, as well as because (i) he was "wearing a construction style high [visibility] vest" and had a ladder attached to the vehicle, (ii) he had two last names, which, "*based on [his] training and experience*, is typically done by people of South American or Spanish countries" (emphasis added), (iii) the van was registered to a cable company, which, based on his "*training and experience*," is a "common place of employment for illegal aliens" where "they are often driving vans or trucks with ladder racks and will have a driver's license which does not match the state of the company in which they are employed" (which, the officer stated, is because they are commonly employed as subcontractors) (emphasis added), (iv) he paused and changed the tone of his voice when he was asked whether he was born in New York.  The Colebrook officer then reached out to U.S. Border Patrol, which told him that the driver's visa expired in 2016.  The officer then called ICE in Manchester, which authorized the officer to make an immigration arrest at 7:18 p.m.  Prior

---

*Asked    Questions*,    https://www.dmv.nh.gov/vehicles-boats-or-titles/vehicle-registrations/vehicle-registration-frequently-asked-questions.

[36] The driver of the van was not violating New Hampshire law by simply driving in New Hampshire.  New York allows all residents 16 years and older, regardless of citizenship status, to apply for a standard, not-for-federal-purpose, non-commercial driver's license, and it appears that the driver in this case had such a license.  *See* N.Y. Dep't of Motor Vehicles, *Driver Licenses and the Green Light Law*, https://dmv.ny.gov/driver-license/driver-licenses-and-the-green-light-law ("All standard New York State driver licenses look the same regardless of the proof documents you provide when you apply.  All standard driver licenses will be marked 'NOT FOR FEDERAL PURPOSES.'").  In New Hampshire House Bill 506, which became effective September 30, 2025, RSA 263:1, IV was added to invalidate in New Hampshire "a driver's license … of a class of licenses issued by another state *exclusively to undocumented immigrants* who are unable to prove lawful presence in the United States when the licenses are issued." (emphasis added); *see also* https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?sy=2025&id=563&txtFormat=html.  As a standard, not-for-federal purpose, non-commercial driver's license (otherwise known as a non-REAL ID compliant license) issued in New York is not issued "exclusively to undocumented immigrants" under RSA 263:1, IV, this New York license is not invalid in New Hampshire.  The criteria under HB 506 has only been applied to Connecticut and Delaware driver's licenses issued to undocumented individuals, not New York licenses (or Massachusetts licenses for that matter).  *See* N.H. Div. of Motor Vehicles, *License Classifications, Restrictions and Endorsements*, https://www.dmv.nh.gov/drivers-licensenon-driver-ids/license-classifications-restrictions-and-endorsements; *see also* Fla. Highway Safety and Motor Vehicle, *Visiting Florida Frequently Asked Questions*, https://www.flhsmv.gov/driver-licenses-id-cards/visiting-florida-faqs/sb1718/ (referencing similar Florida law and stating: "Out-of-state license classes issued to individuals in Connecticut and Delaware without proof of legal presence in the U.S. are not valid in Florida.").

to the arrest, the man's detention appears to have been prolonged by at least 10 minutes to investigate this alleged civil immigration violation.

The Colebrook Police Department officer then brought the handcuffed man to the Department's station. While there that evening, the officer questioned the man and completed the "ICE Interview" questionnaire—a process seemingly designed, at least in part, to solicit admissions from detainees, including whether the person is a "member of a gang" and what the person's status is in the United States. No interpreter was used (though it is unclear whether one was necessary). The man apparently stated that his parents had applied for asylum (though he was "unsure" about the status of that application), and that he had a "fear of returning to [his] country." He signed the answered questionnaire. The officer fed the man and provided a drink purchased at a gas station, removed his handcuffs (though he still had a leg shackle around his left ankle), and allowed the man to make a phone call to his family. The man spent the night sleeping on a bench with blankets provided by the officer. The man stayed the night at the Department's station because no other facility had the ability to hold the man "pending ICE pickup in the morning." The officer told the man that "he would remain here … until ICE comes[s] to pick him up," which was expected to happen the next morning.

The Colebrook Police Department publicly promoted this immigration arrest in a post on its Facebook page that named the driver and included the driver's booking picture. The post stated that the "[t]he goal of this [Section 287(g)] program is to keep our town safe from unvetted individuals who circumvent the systems we have in place to keep our nation and communities safe." However, there is no evidence that the driver committed a crime, though the Colebrook Police Department apparently did issue two written warnings for motor vehicle violations (for failure to display a license plate under RSA 261:176 and for failing to make a complete stop under RSA 265:31).

- **Carroll Police Department**: On Wednesday, December 3, 2025, ICE took into custody seven individuals in a residence in Carroll, New Hampshire, after one of the individuals in the residence was previously arrested by the Carroll Police Department for Driving Under the Influence after a crash on Thursday, November 27, 2025. *See Exhibit O.* A report prepared by a Carroll Police Department lieutenant alleges that this "DUI crash is the 4th DUI/crash-related incident I am aware of originating in the last few months from subjects living at [the residence], all of whom I am aware of being Indian Nationals." Accordingly, "[d]ue to the number and severity of the incidents," the lieutenant, on December 1, 2025, requested that a Carroll Police Department patrolman "inquire with Immigration about the immigration status of the recent arrests." From the unredacted portion of the reports produced, why the lieutenant had a suspicion that those arrested were undocumented— beyond the lieutenant being aware that those arrested were living in the same residence and were "Indian nationals"—is unclear. The patrolman then called ICE, and the patrolman noted the following in his report: "On December 1, 2025, I placed a call to US Customs to inquire about [the status of the driver arrested on November 27], as he had just been arrested for a serious motor vehicle violation. I was advised that he was an overstay on his work visa. Upon further investigation, it was determined that multiple residents of the house were also overstays. One of whom is … currently suspended for DUI and was

arrested several weeks ago for DUI after a different crash." The report from the lieutenant documenting that call with ICE relayed to him from the patrolman also states: "I was later advised by [the Carroll Police Department patrolman] that, due to the severity of the incidents and that they were overstays on their visas, ICE/ERO was requesting that they be taken into custody." The Carroll Police Department patrolman then "set up a date of December 3, 2025, to meet with ICE/ERO to assist in the transport of the subjects." On that date at around 9:00 a.m., the Carroll Police Department then assisted ICE in detaining these seven individuals at the residence. Approximately four of those detained, according to the *Caledonian Record*, did not have any criminal records based on available court information and were not the individuals previously charged with "DUI." *See* <u>Exhibit O</u>.

- **Rockingham County Sheriff's Office**: The Rockingham County Sheriff's Office engaged in two arrests at courthouses. One occurred at or near the Derry District Courthouse on October 23, 2025. The other occurred at or near the Salem District Court on December 16, 2025 after a bench trial on disorderly conduct and resisting arrest charges, and before a verdict was rendered (the person was found not guilty of both charges on December 22, 2025). *See* <u>Exhibit P</u>; <u>Exhibit Q</u> (case summary in state criminal case). The December 16, 2025 arrest is the subject of a habeas petition filed at the U.S. District Court on January 6, 2026. *See* <u>Exhibit Q</u> (docket and habeas petition in *Ata v. Strafford County Department of Corrections et al.,* No. 1:26-cv-00006-PB-TSM). As the petition explains, this person has a U.S. fiancée and two U.S. citizen children. The petition alleges that ICE placed the man on an Order of Supervision in 2009 after several convictions, and that ICE is now detaining the man despite the fact that he has been checking in regularly with ICE since his order of removal in 2009. *Id.*

36.    These immigration enforcement actions by local law enforcement raise questions as to how these agencies were trained by ICE.

37.    For example, was (and, if so, how was) the Troy Police Department chief trained by ICE to handle and question passengers? *See* <u>Exhibit K</u>, at TROY010, 12, 16-17. And was the Troy Police Department chief trained that a passenger is likely to be undocumented when he does not have a driver's license and, instead, has a work authorization card? *Id.* at 10, 12. Indeed, with respect to this passenger in particular, the Troy Police Department contends that it followed "proper procedures" under its Section 287(g) agreement with ICE, *see* <u>Exhibit I</u>, but how do we know what these procedures even are? And was the Troy Police Department police chief given

training on the use of pretextual stops[37] when its chief engaged in immigration enforcement after stopping a vehicle driving the speed limit simply for "all of a sudden" reducing speed to 45 miles per hour?  *See* *Exhibit K*, at TROY007-8.  More broadly, given that seven of the eight drivers the Troy Police Department detained had valid licenses that are also available to documented individuals, what training did that Department's participating officers receive on what constitutes reasonable suspicion that a person is undocumented?

38.     Moreover—given that a Colebrook Police Department officer believed based on his "training and experience" that a man with two last names working for a cable company could be undocumented because having two names "is typically done by people of South American or Spanish countries" and because a cable company is a "common place of employment for illegal aliens"—how was this officer trained in assessing what facts could lead to the reasonable conclusion that a person is undocumented?  *See* *Exhibit N*.  Similarly—as the Colebrook Police Department officer elected to pursue the van because it had "damage to the front bumper and no front license plate" before allegedly later observing two motor vehicle violations that triggered the stop—what training did this officer receive on pretextual stops, as well as what things an officer should look for when deciding whether to follow a vehicle and await traffic violations as a justification to engage in a stop?  *Id.*  And what training did the Colebrook Police Department officer receive in conducting and completing the "ICE Interview" questionnaire?  *Id.*

39.     Further, what training did the Carroll Police Department officer have on the facts that could lead to a suspicion that a person is undocumented when it "placed a call to US Customs to inquire" about the status of persons that had been previously arrested for DUI?  *See* *Exhibit O*.

---

[37] A pretextual stop is a traffic stop that an officer says was made for one reason (like a minor traffic or vehicle equipment violation), but where this reason is pretextual because the officer made the stop for a different reason that would not provide a lawful basis for the stop.

40.     As for the courthouse arrests conducted by the Troy Police Department, *see Exhibit K*, at TROY021-22, 25-27, and the Rockingham County Sheriff's Office, *see Exhibit P*, what procedures are local police departments supposed to follow when engaging in such courthouse arrests?  We do not know.

41.     Additional questions exist after the recent January 7, 2026 killing of Renee Nicole Good in Minneapolis.  Given that this training to local police is supposed to include "the ICE Use of Force Policy," *see Exhibit F*, at p.4, are local police officers participating in the Section 287(g) program trained on how to approach vehicles, whether they should shoot at moving vehicles, and whether (and how) to engage in descalation?[38]  *See also Exhibit T* (ICE's Firearms and Use of Force Policy filed publicly by DHS on November 24, 2025 in *Chicago Headline Club et al v. Noem et al.*, No. 1:25-cv-12173 (N.D. Ill.) at ECF No. 284-39; this exhibit was previously sealed at ECF No. 191-11 as the plaintiffs' exhibit 142 and is described at ECF No. 190); *see also* https://ecf.ilnd.uscourts.gov/doc1/067133625677.

42.     In sum, given the use of these local police departments' arrest power and their ability to use lethal force, learning how these officers are trained is critical and in the public interest.

43.     Perhaps more fundamentally, local taxpayers have an interest in knowing how their local police are spending their time.  *See* 8 U.S.C. § 1357(g)(1) (authorizing the Attorney General to enter into written agreements "at the expense of the State or political subdivision").[39]  To

---

[38] *See* Mark Berman, Maria Sacchetti, Derek Hawkins and David Ovalle, *ICE Tactics and Training Under Scrutiny After Minneapolis Shooting*, WASH. POST (Jan. 10, 2026), https://www.washingtonpost.com/national-security/2026/01/10/minneapolis-shooting-ice-officers-training-policies/.

[39] *See also, e.g.*, James Pinkerton and St. John Barned-Smith, *Sheriff Cut Ties with ICE Program Over Immigrant Detention*, HOUSTON CHRON. (Feb. 21, 2017), https://bit.ly/2IRZW0O ("Gonzalez, a Democrat who took office in January, said he will reassign 10 deputies trained under a U.S. Immigration and Customs Enforcement program known as 287(g) that cost at least $675,000 in salaries and deploy them to other law enforcement duties."); The Commonwealth Inst., *Federal Responsibility, Local Costs: Immigration Enforcement in Virginia* (Sept. 26, 2018), https://bit.ly/2R4jgfP ("ICE sent over 3,100 detainer requests to local and regional jails in Virginia during fiscal year

evaluate whether police participation in a Section 287(g) program is a worthwhile use of police time at the expense of other public safety priorities, the public must understand the policies and procedures that officers are instructed to carry out within such a program.

44. The public's need to know about any training under this program also is critical because—especially where some local agencies may not have a policy cabining their discretion under the program—such training may constitute the only parameters governing the agency's behavior under this program. For example, the Colebrook Police Department (as of December 15, 2025) did not have an internal policy with respect to how to implement the 287(g) program, and the existence of such a policy at the Troy Police Department is unclear.[40]

45. Disclosure also would help New Hampshire taxpayers evaluate the potential public-safety and quality-of-life consequences of Section 287(g) Task Force Model participation, especially given the public concerns about how Section 287(g) participation may decrease trust in law enforcement.[41] In one study, prosecutors, judges, and police officers reported that ramped-up immigration enforcement makes it harder to protect local communities from crime.[42]

---

2017. This is a 75 percent increase from the prior year. If these jails had accommodated the requests, the cost would have been almost $830,000."); ACLU, *Local Jurisdictions Remain Legally Vulnerable for Honoring ICE Detainers* (Apr. 3, 2018), https://www.aclu.org/sites/default/files/field_document/recent_ice_detainer_damages_cases_2018.pdf.

[40] The Carroll Police Department and Rockingham Sheriff's Office do have internal policies developed in implementing the Section 287(g) program. They are attached as *Exhibit R* and *Exhibit S*.

[41] Craig E. Ferrell et al., *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies*, MAJOR CITIES CHIEFS ASS'N, 5-6 (June 2006), https://perma.cc/H5UG-VSA7 ("Immigration enforcement by local police would likely negatively effect and undermine the level of trust and cooperation between local police and immigrant communities.").

[42] Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, NAT'L IMMIGR. WOMEN'S ADVOC. PROJECT, 2-3 (May 3, 2018), https://niwaplibrary.wcl.american.edu/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf ("All four professional groups reported details about the variety of ways their work with immigrant crime victims and LEP has become more difficult in the past two years. Judges reported on how immigration status is being used more frequently by litigants offensively against immigrant victims in a range of family and criminal court cases. Prosecutors similarly reported that defense attorneys are raising immigration status of crime victims in criminal cases and that immigrant victims' willingness to cooperate in criminal prosecutions is declining. Law enforcement personnel observed a decline in immigrant victims'

## CLAIM FOR RELIEF

## COUNT I
## VIOLATION OF FOIA FOR WITHHOLDING THE REQUESTED INFORMATION WITHOUT LAWFUL JUSTIFICATION

46.    All prior paragraphs are incorporated.

47.    ICE's effective determination to withhold the information sought in the Request violates FOIA.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Assume jurisdiction over this matter;

B.    Declare that Defendant's withholding of the information in the Request violates the FOIA;

C.    Issue an injunction ordering Defendant to immediately disclose the information in the Request and to make copies immediately available to Plaintiff without charge for any search or duplication fees;

D.    Award reasonable costs and attorney's fees incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

E.    Grant such further relief as the Court deems just and proper.

---

willingness to cooperate in criminal prosecutions as well an increase in difficulty of investigating criminal cases involving immigrant crime victims because of immigrant and LEP victims' reluctance to cooperate.  Similarly, victim advocates and attorneys saw declines in the number of immigrant victims willing to file for civil protection orders and for VAWA and U visa immigration relief and the number of immigrant domestic violence victims willing to call the police for help.").

Respectfully submitted,

By and through his attorneys affiliated with the American Civil Liberties Union Foundation of New Hampshire,

*/s/ Gilles Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Chelsea Eddy (N.H. Bar No. 276248)
SangYeob Kim (N.H. Bar No. 266657)
Henry R. Klementowicz (N.H. Bar No. 21177)
Caroline Meade*
AMERICAN CIVIL LIBERTIES UNION OF NEW
    HAMPSHIRE
18 Low Avenue
Concord, NH  03301
Tel.: 603.333.2081
gilles@aclu-nh.org
chelsea@aclu-nh.org
sangyeob@aclu-nh.org
henry@aclu-nh.org
caroline@aclu-nh.org

*  *pro hac vice* application forthcoming

Date:   January 15, 2026