# EXHIBIT L

U.S. Department of Homeland Security    Subject ID : 400324050    **Record of Deportable/Inadmissible Alien**

| Family Name (CAPS) | First | Middle | | Sex | Hair | Eyes | Cmplxn |
|---|---|---|---|---|---|---|---|
| ████████████████ | | | | M | BRO | BRO | MED |

| Country of Citizenship | Passport Number and Country of Issue | File Number | Height | Weight | Occupation |
|---|---|---|---|---|---|
| BRAZIL | ██████████████ | █████████████ | 68 | 161 | LABORER |

**U.S. Address**
266 COUNTY FARM RD DOVER, NEW HAMPSHIRE, 03820,

| Scars and Marks |
|---|
| |

| Date, Place, Time, and Manner of Last Entry | | Passenger Boarded at |
|---|---|---|
| Unknown Date Unknown Time, | | |

| F.B.I. Number | ☑ Single |
|---|---|
| | ☐ Divorced ☐ Married |

Number, Street, City, Province (State) and Country of Permanent Residence

| | | ☐ Widower ☐ Separated |
|---|---|---|
| Method of Location/Apprehension |
| █ |

| Date of Birth | Age: 23 | Date of Action | Location Code | At/Near | Date/Hour |
|---|---|---|---|---|---|
| ██████████ | | 10/07/2025 | MAN/BOS | Troy NH | 10/07/2025 09:24 |

| City, Province (State) and Country of Birth | | By |
|---|---|---|
| ████████ BRAZIL | AR ☒  Form i. (Type and No.) Lifted ☐ Not Lifted ☐ | ████████████ |

| NIV Issuing Post and NIV Number | Social Security Account Name | Status at Entry | Status When Found |
|---|---|---|---|
| | | | |

| Date Visa Issued | Social Security Number | Length of Time Illegally in U.S. |
|---|---|---|
| | | |

| Immigration Record | Criminal Record |
|---|---|
| NEGATIVE | |

| Name, Address, and Nationality of Spouse (Maiden Name, if Appropriate) | Number and Nationality of Minor Children |
|---|---|
| | None |

| Father's Name, Nationality, and Address, if Known | Mother's Present and Maiden Names, Nationality, and Address, if Known |
|---|---|
| ██ NATIONALITY: ██ ADDRESS: ██████████ | |

| Monies Due/Property in U.S. Not in Immediate Possession | Fingerprinted? ☑ Yes ☐ No | Systems Checks | Charge Code Words(s) |
|---|---|---|---|
| None Claimed | | | See Narrative |

| Name and Address of (Last)(Current) U.S. Employer | Type of Employment | Salary | Employed from/to |
|---|---|---|---|
| | Unemployed or Retired | Hr | |

Narrative (Outline particulars under which alien was located/apprehended. Include details not shown above regarding time, place and manner of last entry, attempted entry, or any other entry, and elements which establish administrative and/or criminal violation. Indicate means and route of travel to interior.)

FIN: ████████████

Left Index fingerprint                    Right Index fingerprint

**Subject Health Status**
----------------------
**The subject claims good health.**

**Current Administrative Charges**
--------------------------------
10/06/2025 - 212a6Ai - ALIEN PRESENT WITHOUT ADMISSION OR PAROLE - (PWAs)
10/07/2025 - 212a7Aii - IMMIGRANT WITHOUT AN IMMIGRANT VISA

...(CONTINUED ON I-831)

| | D6338 ████ |
|---|---|
| | Deportation Officer |
| Alien has been advised of communication privileges    (Date/Initials) | (Signature and Title of Immigration Officer) |

| Distribution: | Received: (Subject and Documents) (Report of Interview) |
|---|---|
| | Officer: ███████████ |
| | on: October 7, 2025                    (time) |
| | Disposition: Warrant of Arrest/Notice to Appear |
| | Examining Officer: ████████████████ |

EOIR — 1 of 3

Form I-213 (Rev. 08/01/07)

U.S. Department of Homeland Security                    Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| ███████████ | Event No: ███████ | 10/10/2025 |

**Record of Deportable/Excludable Alien:**
----------------------------------------

**ENCOUNTER:**

On 10-6-2025, ████████, ████████ was stopped for speeding by the Troy, NH Police Department. During the stop, ████████ told Troy Police he is a citizen of Brazil and handed him an employment authorization card ████████) when asked for identification. Troy, NH Police is part of the 287g Program which authorizes local law enforcement to enforce limited immigration enforcement authority during routine police enforcement duties. Troy Police also spoke with Deportation Officer (DO) ████ of the Boston, Manchester ICE ERO sub office, who ran checks on ████████. The records checks showed ████████ to be a citizen and nation of Brazil was previously in Removal Proceedings. Records checks were negative for any legal entry into the United States, or any lawful status in the United States. DO informed Troy Police they were good to arrest ████████ under their 287g authority. Troy Police transported ████████ to the ICE ERO office in Manchester, NH for processing. ████████ was arrested without a warrant because he is likely to abscond. He was in a vehicle that could drive anywhere at the time of his arrest. He does not have any children, family, property, or other ties that would keep him in any one place.

**ALIENAGE:**

Once at the ERO office, ████████ confirmed to DO Schwartz that he is a citizen and national of Brazil. During administrative processing ████████'s fingerprints were digitally captured and submitted to both the IDENT and NGI databases for comparison to existing records. Both IDENT and NGI indicated that the fingerprint impressions submitted were a match to those taken from ████████, a citizen of Brazil, whose alien registration number is ████████. A subsequent review of ICE records detailing the immigration history contained in A-File ████████ indicated that ████████ is citizen and national of Brazil who was arrested by the United States Border Patrol and placed into removal proceedings.

**DERIVATIVE CITIZENSHIP DATA:**

████████ entered the United States without inspection. He did not make any claim to UCS. He stated both his parents are citizens of Brazil with no claim to USC.

**ENTRY DATA :**

████████ entered the United States without permission, or inspection on an unknown date and at an unknown location.

**CRIMINAL HISTORY:**
None known.

**IMMIGRATION HISTORY:**
06-18-2023- Illegally entered U.S.
06-18-2023- Arrested by USBP and served NTA, released into U.S.
04-26-2024- IJ Terminated proceedings due to DHS non-appearance.
10-06-2025- Arrested 287g by Troy, NH Police.
10-07-2025- Processed by MAN ERO, served NTA detained.

**GANG / TERRORIST AFFILIATION:**

| Signature | Title |
|---|---|
| ███████ | Deportation Officer |

_____ 2 _____ of _____ 3 _____ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

**U.S. Department of Homeland Security**                    Continuation Page for Form I-213

| Alien's Name | File Number | Date |
|---|---|---|
| ███████ | ███████<br>Event No: ███████ | 10/10/2025 |

None known.

CONSENT TO ENTER AND SEARCH:
N/A

CREDIBLE / REASONABLE FEAR:
███████ did not claim to have a fear of returning to Brazil.

MILITARY SERVICE:
███████ has not served in the United States Military.

CHILD CARE/CUSTODY ISSUE:
███████ claims to not be the sole caretaker to anyone.

MEDICAL HISTORY:
███████ stated that he does not have any medical problems or need for medication.

RECOMMENDATION / DISPOSITION:
███████ was served a Notice to Appear and was given detention information, consulate information, and FLSP, and EOIR-33.


Other Identifying Numbers
-----------------------------
ALIEN-███████

| Signature | Title |
|---|---|
| ███████ | Deportation Officer |

_3_ of _3_ Pages

Form I-831 Continuation Page (Rev. 08/01/07)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| ███████████████ | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| **CHRISTOPHER BRAKETT,** Superintendent, | ) |
| Strafford County Department of Corrections; | ) |
| **PATRICIA H. HYDE,** | ) |
| Field Office Director at ICE Boston Field Office; | ) |
| **TODD LYONS,** Acting Director of | ) |
| U.S. Immigration and Customs Enforcement | ) |
| **KRISTI NOEM,** Secretary of the U.S. | ) |
| Department of Homeland Security; | ) |
| and, **PAMELA BONDI,** | ) |
| Attorney General of the United States, | ) |
| in their official capacities | ) |
| | ) |
| Respondents. | ) |
| | ) |

**PETITION**
**FOR WRIT OF**
**HABEAS CORPUS**

## **INTRODUCTION**

1.  ███████████████ (hereinafter referred to as ██████,” “Mr. ████████,” or “Petitioner”) seeks to file this Petition for Writ of Habeas Corpus with the Court.

2.  Mr. ████████ is a Brazilian citizen who entered the U.S. on June 18, 2023. Before detention, Petitioner was residing at ██████████████████, Lowell, MA 01851. He is currently detained at the Strafford County Corrections, located at 266 County Farm Road, Dover, NH 03820.

3.  Mr. ████████ entered the United States without admission on June 18, 2023. He was detained by Customs and Border Protection (“CBP”), released upon order of recognizance, and placed in removal proceedings.

4. On November 20, 2023, a Form I-360, Petition for Special Immigrant Juvenile ("SIJ") filed by Mr. ███████ was approved by the U.S. Citizenship and Immigration Services ("USCIS"). The approval granted him deferred action status, meaning he was authorized to remain in the United States while waiting for USCIS to allow him to submit his application for adjustment of status and become a Legal Permanent Resident. *See* Ex. 5.

5. Based on the approval of his Form I-360 and his granted deferred action, Petitioner filed a Motion to Terminate Removal Proceedings with the Immigration Court, which was granted on April 26, 2024. The Department of Homeland Security ("DHS") had an opportunity to oppose the motion or appeal the decision, but they did not. The termination was intended to allow Petitioner to file for adjustment of status before USCIS once a visa becomes available for him.

6. The grant of deferred action was given because the government has not yet authorized him to file for adjustment of status, although they recognized his eligibility through the I-360 approval. Petitioner is waiting for his priority date to become current so he can file to become a lawful permanent resident as a special immigrant juvenile. Because of the deferred action, he retained lawful permanence in the U.S. and received employment authorization. *See* Ex. 5-6.

7. However, on October 6, 2025, Mr. ███████ was detained in Troy, New Hampshire. He was stopped by the Troy, NH, Police Department for allegedly spending. The Troy Police Department, which signed a 287g agreement with Immigration and Customs Enforcement ("ICE"), contacted an ICE officer, who told the police to arrest the Petitioner because he had "no lawful status in the United States." The police, without a warrant, arrested Mr. ███████ and immediately transported him to the ICE ERO office in Manchester, NH. Petitioner has

since been transferred to Strafford County Corrections, NH, where he remains detained. *See* Ex. 2-3.

8. Petitioner attempted to get a bond before the Immigration Court, but the Court denied jurisdiction to hear his bond motion. *See* Ex. 1.

9. Petitioner's detention violates federal law, as well as the Fifth Amendment of the United States Constitution. His arrest has also violated the Fourth Amendment.

10. Accordingly, to vindicate Petitioner's statutory and constitutional regulatory rights, this Court should grant the instant petition for a writ of habeas corpus. Mr. ███████ requests that this Court immediately release him from detention and enjoin the Respondents from re-detaining him unless there are changes in the circumstances that would justify detention.

11. Furthermore, Petitioner also requests this Court to issue a restraining order to prevent Petitioner from being transferred from the state of New Hampshire for the duration of these proceedings.

## **JURISDICTION**

12. This action arises under the Constitution of the United States and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

13. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus) and 28 U.S.C. § 1331 (federal question).

14. This Court may grant relief under the habeas corpus statutes, 28 U.S.C. § 2241 *et. seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the All Writs Act, 28 U.S.C. § 1651.

## **VENUE**

15. Venue is proper in this District because Respondents are officers, employees, or agencies of the United States, and the Petitioner is currently detained within the jurisdiction of this District.

28 U.S.C. § 2241.

## **PARTIES**

16. Petitioner is a Brazilian citizen who entered the U.S. on June 18, 2023. He has never left the country since. He has a Form I-360 approval as a Special Immigrant Juvenile. He is detained at Strafford County corrections, in Dover, New Hampshire, and is in custody and under the direct control of Respondents and their agents.

17. Respondent, Christopher Brakett, is named in his official capacity as the Superintendent of Strafford County Department of Corrections. In this capacity, Mr. Brakett has custody over Mr. ███████ because ICE contracts the Strafford County Department of Corrections to house immigration detainees, including Mr. ███████.

18. Respondent, Patricia H. Hyde, Field Office Director at Boston Field Office, is sued in her official capacity as the Acting Director of U.S. Immigration and Customs Enforcement. She is a legal custodian of the Petitioner and has the authority to release her.

19. Respondent, Todd Lyons, is sued in his official capacity as the Acting Director of U.S. Immigration and Customs Enforcement. He is responsible for the overall administration, supervision, and enforcement of immigration detention and removal operations nationwide, including policies governing the custody and release of noncitizens. Respondent Lyons is therefore a legal custodian of Petitioner.

20. Respondent, Kristi Noem, is sued in her official capacity as the Secretary of U.S. Department of Homeland Security ("DHS"). In her capacity, Respondent Noem is responsible for the implementation and enforcement of the Immigration and Nationality Act, and oversees U.S.

Immigration and Customs Enforcement, the component agency responsible for Petitioner's detention. Respondent Noem is a legal custodian of Petitioner.

21. Pamela Bondi, Attorney General of the United States, is sued in her official capacity and as the legal representative of the U.S. government.

## **STATEMENT OF FACTS**

22. Mr. ██████ is a Brazilian citizen who entered the U.S. on June 18, 2023. Before detention, Petitioner was residing at ████████████████, Lowell, MA 01851. He is currently detained at the Strafford County Corrections, located at 266 County Farm Road, Dover, NH 03820.

23. Following Mr. ██████'s entry into the United States, he was detained by CBP. He was then placed in removal proceedings before the Immigration Court. After being placed in removal proceedings, Petitioner was released from CBP custody and authorized to enter the country to await his removal proceedings.

24. Petitioner received an order from the Massachusetts Probate and Family Court pursuant to Massachusetts G.L. c. 119 §39M, stating that the he is dependent upon the Court for his care and protection, that reunification with one of both his parents is not viable due to abuse, neglect or abandonment, that it is not in his best interest to return to Brazil, and it is in his best interest to remain in the United States. Based on this order, Petitioner filed Form I-360 with USCIS, which was granted on November 20, 2023. *See* Ex. 5.

25. Although the I-360 approval recognized the Petitioner's eligibility to seek adjustment of status and become a lawful permanent resident, he was not immediately able to do so because the government controls the number of visas that are available for each category. The government

has not yet authorized applicants with the same priority date as the Petitioner to file their adjustment of status. Therefore, Petitioner was placed in a situation in which he had approval recognizing his eligibility for adjustment of status, but would have to wait for the government to authorize him to apply.

26. Because of this situation, the approval of Form I-360 granted him deferred action status, meaning that he was authorized to remain in the United States while waiting for an available visa to file for his adjustment of status and become a Legal Permanent Resident. *See* Ex. 5-6.

27. Based on the I-360 approval and Petitioner's eligibility for adjustment of status, Petitioner filed a Motion to Terminate proceedings before the Immigration Court, which was granted on April 26, 2024. DHS could have filed an opposition, filed a motion to reconsider with the Immigration Court, or appealed the decision, but they chose not to do so. The decision became final, and Petitioner's removal proceedings were terminated. Thus, Respondents DHS and the Department of Justice ("DOJ") recognized, through the termination, that it was not in their interest to continue pursuing Petitioner's removal based on his eligibility for adjustment of status.

28. On October 6, 2025, Mr. ███████ was stopped by the Troy Police Department for allegedly speeding. The Troy Police recently signed an agreement with ICE to be part of the 287g program, in which law enforcement takes part in immigration enforcement authority during routine police enforcement duties. *See* Ex. 2-3.

29. After being stopped by the police for allegedly speeding, the Troy Police officers contacted a Deportation Officer ("DO") from the ICE ERO sub office, who "ran checks on [Mr. ███████]". According to the information provided by ICE, "Records checks were negative

for any legal entry into the United States, or any lawful status in the United States. DO Schawrtz informed Troy Police they were good to arrest [Mr. ███████] under their 287g authority." Mr. ███████ was then transferred to ICE ERO office in Manchester, NH, for processing, and arrested without a warrant because, according to the police, "he was likely to abscond" as "[he] was in a vehicle that could drive anywhere at the time of his arrest." *Id.*

30. Petitioner was then transferred to the Strafford County Corrections in Dover, NH, where he remains detained.

31. Petitioner has requested a bond hearing before the Immigration Court, which took place on October 23, 2025. However, based on recent decisions by the Board of Immigration Appeals, specifically *Matter of Yajure Hurtado,* the Immigration Judge denied jurisdiction over Petitioner's bond case and allowed the government to continue detaining Petitioner indefinitely without an opportunity for an independent adjudicator to analyze his custody. *See Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). *See* Ex. 1.

32. The reason for Petitioner's detention remains unclear, especially considering that he is eligible for adjustment of status, he had deferred action at the time of his detention, and his removal proceedings had been terminated recently by the Immigration Court. Petitioner is also not tied to any reasonably foreseeable removal, as his proceedings were previously terminated, and he is eligible for adjustment of status. He is currently scheduled for a Master Calendar Hearing before the Immigration Court on November 6, 2025. This is a preliminary hearing.

33. Petitioner's detention violates the Fifth and Fourth Amendments of the United States Constitution and federal law. Petitioner is detained without even having an opportunity to have

a bond hearing, and Respondents have infringed his constitutional rights by unlawfully arresting and detaining him.

## LEGAL FRAMEWORK

34. The Immigration and Nationality Act ("INA") establishes the statutory framework governing the entry, presence, and removal of noncitizens in the United States. Regulations promulgated by the agencies charged with enforcing the INA set forth specific procedures for classifying noncitizens. When a noncitizen arrives at the border seeking entry into the United States, they are deemed an "applicant for admission." The INA defines several grounds of "inadmissibility." For example, a noncitizen who arrives at a port of entry without being admitted or paroled – such as Petitioner – may be found inadmissible pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).

35. Under 8 U.S.C. § 1225, "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." Applicants for admission are among the individuals who can be placed in expedited removal, in which case they are subject to mandatory detention. INA § 235(b)(1)(B)(i)(IV).

36. If an applicant for admission is not placed in expedited removal proceedings under INA § 235 or is later placed in removal proceedings under INA § 240, detention is no longer mandatory. In these cases, noncitizens are sometimes released from custody and allowed to remain in the United States for the duration of their proceedings. 8 U.S.C. § 1226 (a).

37. Recently, however, Immigration Courts have shifted their long-standing interpretation, holding that they lack jurisdiction to conduct custody redeterminations for individuals who were placed in proceedings upon arrival, later released into the United States, and then detained years afterward for a different reason. Recent decisions by the Board of Immigration Appeals ("BIA") have stripped Immigration Judges of jurisdiction over these cases. *See Matter of Q. LI*, 29 I&N Dec. 66 (BIA 2025); *also Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). The latter decision is based on a position that every individual who unlawfully entered the U.S., not matter how long they have remained in the U.S. or where they were apprehended, is an "applicant for admission."

38. The recent interpretation by the BIA, which was adopted after a novel interpretation of the law by DHS, violates the Fifth Amendment, and is also contrary "to the plain text of the statute and the overall statutory scheme." *Aguiriano Romero v. Hyde*, No. 25-cv-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025); *also Diaz Martinez v. Hyde*, — F. Supp. 3d —, 2025 WL 2084238 (D. Mass. July 24, 2025); *see also, e.g.*, *Rodriguez Vazquez v. Bostock*, 779 F. Supp. 3d 1239, 1277 (W.D. Wash. 2025) (holding same); *Gomes v. Hyde*, 2025 WL 1869299 (D. Mass. July 7, 2025) (same); *Garcia v. Hyde*, Civ. No. 25-11513 (D. Mass. July 14, 2025) (same); *Rosado v. Bondi*, 2025 WL 2337099 (D. Ariz. Aug. 11, 2025) (same), *report and recommendation adopted without objection*, 2025 WL 2349133 (D. Ariz. Aug. 13, 2025); *Lopez Benitez v. Francis*, — F. Supp. 3d —, 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025) (same); *dos Santos v. Noem*, 2025 WL 2370988 (D. Mass Aug. 14, 2025) (same); *Aguilar Maldonado v. Olson*, 2025 WL 2374411 (D. Minn. Aug. 15, 2025) (same); *Escalante v. Bondi*, 2025 WL 2212104 (D. Minn. July 31, 2025) (granting preliminary relief after positively

weighing likelihood of success), *report and recommendation adopted sub nom. O. E. v. Bondi*, 2025 WL 2235056 (D. Minn. Aug. 4, 2025); *Arrazola-Gonzalez v. Noem*, 2025 WL 2379285 (C.D. Cal. Aug. 15, 2025) (granting individualized bond hearings on *ex parte* motion for temporary restraining order after finding likelihood of success); *Garcia Jimenez v. Kramer*, 2025 WL 2374223 (D. Neb. Aug. 14, 2025) (granting relief from stay of bond order pending BIA appeal); *Mayo Anicasio v. Kramer*, 2025 WL 2374224 (D. Neb. Aug. 14, 2025) (same); *Rodrigues De Oliveira v. Joyce*, 2025 WL 1826118 (D. Me. July 2, 2025) (recognizing disagreement as to the detention statutes and granting habeas petition on due process grounds). *But see Pena v. Hyde*, 2025 WL 2108913 (D. Mass. July 28, 2025) (distinction between §§ 1225 and 1226 not addressed); S*ee Salazar v. Dedos*, No. 1:25-cv-00835-DHU-JMR, 2025 WL 2676729 (D.N.M. Sep. 17, 2025) ("The Court found at the hearing that Petitioner's detention is rightfully governed by 8 U.S.C. § 1226(a), rather than § 1225(b)(2)(A), and ordered that he receive an individualized bond hearing under § 1226 no later than 7 days from the date of the hearing. In the absence of such a bond hearing, the Court ordered Petitioner's immediate release.").

39. Statutory authority for warrantless enforcement actions is provided in 8 U.S.C. § 1357. Under 8 U.S.C. § 1357(a)(2), ICE officers may conduct warrantless arrests if there is "reason to believe" that the potential arrestee (1) "is in the United States in violation of [an immigration] law or regulation" and (2) "is likely to escape before a warrant can be obtained for his arrest." *Nava v. Dep't of Homeland Sec.*, 435 F.Supp.3d 880, 885 (N.D. Ill. 2020). Mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be obtained. *Id.*

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of the Immigration and Nationality Act (INA)

40. As mentioned, the Immigration and Nationality Act (INA) establishes the statutory framework governing the entry, presence, and removal of noncitizens in the United States. Regulations promulgated by the agencies charged with enforcing the INA set forth specific procedures for classifying noncitizens.

41. Mr. ███████ was detained at the border, but he was neither placed into expedited removal proceedings nor held pending the outcome of such proceedings. Petitioner was arrested and released under section 236 of the INA, referred to here as 8 U.S.C. § 1226.

42. He has been living in the United States since his entry, and he has made every effort to legalize his status. He filed for Special Immigrant Juvenile status, and USCIS approved his petition, making him eligible for adjustment of status. Because of the approval and his eligibility, his proceedings before the Immigration Court were terminated, and Petitioner is simply waiting for the government to allow him to apply to become a legal permanent resident.

43. Nonetheless, Mr. ███████ was recently detained – without any clear rationale provided – and he was denied an opportunity to have a bond hearing before the immigration court based on a novel interpretation by DHS and DOJ that all individuals who entered the United States unlawfully are considered to be "applicants for admission" and therefore subject to mandatory detention. This includes individuals who have been in the United States for several years.

44. Mandatory detention for all applicants has only been the official policy of the Department of Homeland Security ("DHS") since July 8, 2025, when Acting Director of U.S. Immigration

and Customs Enforcement, Todd M. Lyons, issued an internal memorandum explaining that the agency had "revisited its legal position."[1] *See Martinez v. Hyde*, No. CV 25-11613-. BEM, 2025 WL 2084238.

45. Recently, the BIA, a part of the Executive Office for Immigration Review ("EOIR"), which operates under the DOJ's authority, has agreed with the interpretation in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). It should be noted that one of the measures of the current administration was to reduce the number of judges at the BIA from 28 to 15, ensuring that most of the judges currently serving on the board were appointed by the current presidential administration, either during this term or in the prior one.[2]

46. Here, the DOJ is part of this process, and the internal memorandum discussing the change in interpretation indicates that the decision to strip immigration judges of jurisdiction over bond hearings was made "in coordination with the DOJ," affirming that section 1225 "is the applicable immigration detention authority for all applicants for admission."[3] Furthermore,

---

[1] The existence of the memorandum was first reported by the Washington Post on July 14, 2025. Maria Sacchetti & Carol D. Leonnig, ICE declares millions of undocumented immigrants ineligible for bond hearings … The memorandum itself was subsequently leaked by legal advocacy groups. … The admitted novelty of the Government's legal argument may shed some light on why the Petitioner and Court had such a difficult time recognizing it at first blush.] DHS, in coordination with the Department of Justice (DOJ), has revisited its legal position on detention and release authorities. DHS has determined that [section 1225] of the Immigration and Nationality Act (INA), rather than [section 1226], is the applicable immigration detention authority for all applicants for admission

[2] *Reducing the Size of the Board of Immigration Appeals*, 90 Fed. Reg. 15,525 (Apr. 14, 2025); *also* Adriel Orozco, *While Federal Firings Focus on Immigration Processing, Funding for Immigration Enforcement Expands*, AM. IMMIGRATION COUNCIL (Mar. 6, 2025), https://www.americanimmigrationcouncil.org/blog/federal-firings-immigration-processing-enforcement-expands/

[3] *See Diaz Martinez*, 2025 WL 2084238, at *4 & nn.10–11 (citing Acting ICE Director Todd M. Lyons's July 8, 2025 memorandum, "Interim Guidance Regarding Detention Authority for Applicants for Admission").

former immigration judges have reported that they were "told to rule in a certain way" by superiors, and there was "pressure from above."[4]

47. Regardless of the reasons for the change in interpretation by both the DHS and the DOJ, this change does not align with the statute, the jurisprudence, the overall structure of the statute, decades of practice and understanding by Immigration Judges and the agencies, the logic of the immigration system, and the protections established in the Constitution. **In other words, Respondents' interpretation violates federal law and due process protections.**

48. **First**, Respondents' proposed interpretation, which is currently being adopted in Immigration Courts to deny noncitizens the right to a bond hearing, is contrary to the plain text of the law. As explained by the Massachusetts District Court in *Aguiriano Romero v. Hyde*, No. 25-cv-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025), § 1225(b)(2)(A) applies only when three distinct conditions are met: (1) an examining immigration officer determines that the person is an "applicant for admission"; (2) the person is "seeking admission"; and (3) the officer concludes that the individual is "not clearly and beyond a doubt entitled to be admitted." *Id. (*quoting *Diaz Martinez,* 2025 WL 2084238, at 3), because "examination" refers to the specific legal process applicable at ports of entry. 8 C.F.R. § 235.1.

49. The proposed interpretation of the law by the Respondents also proposes that the terms "applicant for admission" and "seeking admission" are synonymous, when they are not. In *Garcia Cortes v Noem,* the Court held that "seeking admission" implies present-tense action, and without it, Section 1225(b)(2)(A) could not apply. *Garcia Cortes v. Noem*, No. 1:25-cv-

---

[4] Oscar Margain, *Fired immigration judges describe threat to judicial independence from Justice Dept.*, NBC BOSTON, https://www.nbcboston.com/news/local/fired-us-immigration-judge-interviews/3776340/ (July 25, 2025) [https://perma.cc/G6FL-8D73].

02677, (D. S.D. 2025) (slip op.). An "applicant for admission" refers to a noncitizen who is present in or arriving at the United States and is undergoing inspection by an immigration officer to determine whether they are clearly entitled to enter. *See* 8 U.S.C. § 1225(a)(3), (b)(2)(A); 8 C.F.R. § 235.1. In contrast, the phrase "seeking admission" is broader and describes the act or intent of requesting entry, which may occur even while the individual is outside the United States, such as by applying for a visa at a consulate or preparing to present at a port of entry. *See Matter of Lemus-Losa, 25 I. & N. Dec. 734, 741 (BIA 2012)*. As the court explained in *Diaz Martinez*, Congress's decision to refer to "aliens … who are applicants for admission or otherwise seeking admission," 8 U.S.C. § 1225(a)(3), shows that the two categories are not coterminous. *Diaz Martinez v. Hyde*, No. 25-cv-10924-BEM, 2025 WL 2084238. Reading them as synonymous would erase this textual distinction and expand § 1225(b)(2)(A) far beyond its intended scope, encompassing individuals who have long resided in the United States and are not presently seeking to enter, such as the Petitioner here.

50. Thus, DHS's and the DOJ's selective reading of the statute – which disregards its "seeking admission" language – violates the rule against surplusage and undermines the plain meaning of the text. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning."), quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *United States v. Abbas*, 100 F.4th 267, 283 (1st Cir. 2024) ("'We begin, as always, with the text of the statute' and read it 'according to its plain meaning at the time of enactment,'" quoting *United States v. Winczuk*, 67 F.4th 11, 16 (1st Cir. 2023), cert. denied, 145 S. Ct. 319 (2024)).

51. **Second**, the interpretation used by Respondents also conflicts with the general structure of the statute. If Respondents' interpretation was deemed correct, it would render significant portions of 8 U.S.C. § 1226 meaningless, violating one of the most basic canons governing the interpretation of federal statutes, which provides that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant …" *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotations omitted); *Shulman v. Kaplan*, 58 F.4th 404, 410-11 (9th Cir. 2023). "This principle ... applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 607-08 (2010).

52. Here, the DOJ and DHS's position is that Petitioner is subject to the mandatory detention provision, and so he should be detained until the finality of his removal proceedings without the opportunity to have a bond hearing. If their interpretation of § 1225 is correct and this section's mandatory detention provisions apply to all noncitizens present in the United States who have not been admitted, it would render superfluous provisions of § 1226 that apply to certain categories of inadmissible noncitizens who have committed specified criminal offenses. *See* § 1226(c)(1)(A), (D), (E); *Shulman v. Kaplan*, 58 F.4th 404, 410–11 (9th Cir. 2023); *Torres v. Barr*, 976 F.3d 918, 930 (9th Cir. 2020) (en banc). Under Respondents' proposed interpretation, which is based on a recent change in DHS's policies, § 1226(c)(1)(E)'s mandated detention for inadmissible noncitizens who are implicated in an enumerated crime, including those "present in the United States without being admitted or paroled," would be meaningless and superfluous because "all noncitizens who have not been admitted" would already be governed by § 1225's mandatory detention authority. *See Shulman*, 58 F.4th at 410-

15

11. *See also Corley v. United States,* 556 U.S. 303, 314 n.5 (2009) (explaining that seemingly conflicting statutes read in isolation can be reconciled if read in their broader context, which includes observing the "antisuperflousness" canon).

53. The Supreme Court's decision in *Jennings* likewise supports harmonizing §§ 1225 and 1226 in a manner contrary to Respondents' position. The Court described § 1225 as part of the process that "generally begins at the Nation's borders and ports of entry, where the Government must determine whether a [noncitizen] seeking to enter the country is admissible." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). In contrast, the Court explained that § 1226 governs "the process of arresting and detaining" noncitizens who are living "inside the United States" but "may still be removed," including those "who were inadmissible at the time of entry." *Id.* at 288. The Court summarized the distinction succinctly: "U.S. immigration law authorizes the Government to detain certain [noncitizens] seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [noncitizens] already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* at 289.

54. Notably, several of the exceptions in § 1226(c) that would be rendered superfluous under the IJ's interpretation of §§ 1225 and 1226 were only recently enacted by Congress in the Laken Riley Act ("LRA"). "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995) (citation omitted). Enacted in January 2025, the LRA amended multiple INA provisions, including §§ 1226 and 1225. See LRA, Pub. L. No. 119-1, 139 Stat. 3 (2025). Pertinent here, the LRA added a new category of noncitizens to § 1226(c)'s mandatory detention authority—

those deemed inadmissible, including for being "present in the United States without being admitted or paroled," who have been arrested, charged with, or convicted of certain crimes. 8 U.S.C. § 1226(c)(1)(E); LRA, Pub. L. No. 119-1. By specifically excepting these criminally implicated inadmissible noncitizens from § 1226(a)'s default discretionary detention framework, Congress necessarily left all other inadmissible noncitizens—those without the specified criminal involvement—subject to § 1226(a). See *Jennings*, 583 U.S. at 289; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010).

55. **Third**, the legislative history also shows that Respondents' interpretation directly conflicts with Congress intent when creating the statute, as well as all the changes made after its promulgation. Congress enacted the LRA in the context of the longstanding agency practice of applying § 1226(a) to inadmissible noncitizens already residing in the country. Another "customary interpretive tool" is the principle that "[w]hen Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'" courts "generally presume[] the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez v. Bondi*, 604 U.S. ___, 145 S. Ct. 1232, 1242 (2025) (quoting *Haig v. Agee*, 453 U.S. 280, 297–98 (1981)). In *Monsalvo Velazquez*, the Court emphasized that when a statute is "susceptible" to more than one reasonable interpretation, courts should adopt the reading that is "consistent" with the statute's "longstanding administrative construction." *Id.* Congress's amendments to § 1226(c) in the LRA were made with full awareness of decades of agency practice treating inadmissible noncitizens – such as Mr. ███████ – under § 1226(a)'s discretionary detention framework. Congress, therefore, presumably intended to preserve "the same understanding" of the statute as had been consistently applied by the agency. *Id.*

56. The legislative history of § 1226 reinforces that it governs the detention of noncitizens – like Mr. ████ – who were found in the United States after not having applied for admission. Prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), the predecessor to § 1226(a) governed deportation proceedings for all noncitizens arrested within the United States. *See* 8 U.S.C. § 1252(a)(1) (1994) ("Pending a determination of deportability ... any [noncitizen] ... may, upon warrant of the Attorney General, be arrested and taken into custody."); *Hose v. INS*, 180 F.3d 992, 994 (9th Cir. 1999) (noting that a "deportation hearing" was the "usual means" of proceeding against a noncitizen physically present in the United States). Like § 1226(a), the predecessor statute authorized discretionary release on bond. See 8 U.S.C. § 1252(a)(1) (1994). When Congress enacted IIRIRA, it expressly stated that § 1226(a) "restates the current provisions in [the predecessor statute] regarding the authority of the Attorney General to arrest, detain, and release on bond" a noncitizen "who is not lawfully in the United States." H.R. Rep. No. 104-469, pt. 1, at 229; see also H.R. Rep. No. 104-828, at 210. Because noncitizens in Mr. ████'s position were entitled to discretionary detention under the predecessor statute, and Congress confirmed that IIRIRA did not narrow that authority, § 1226 should likewise be interpreted to allow discretionary release on bond for similarly situated noncitizens.

57. **Fourth**, Respondents' interpretation of § 1226 is undermined by the DHS's longstanding practice of treating noncitizens taken into custody while residing in the United States—including those who were initially found inadmissible upon inspection but released into the country with the government's acquiescence and who have committed no crimes since—as detained under § 1226(a). *See Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 386 (2024).

"[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." *Id.* (internal quotations omitted, second brackets in original). The Supreme Court has further recognized that deference to executive interpretations of federal statutes is "especially warranted when [the interpretation] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* The subsequent shift toward a regime that seeks to expedite the removal of noncriminal noncitizens who have resided in the country for several years is insufficient to support a good-faith belief that the change in interpretation rests on anything other than political convenience to justify the government's concerning actions.

58. Finally, the interpretation of the DOJ and DHS here directly violates the First Circuit finding in *Hernandez Lara v. Barr*, No. 19-1524 (1st Cir. 2020), which decided that in order for the government to detain a noncitizen under 1226(a), "due process requires the government to either (1) prove by clear and convincing evidence that she poses a danger to the community or (2) prove by the preponderance of the evidence that she poses a flight risk." *Hernandez Lara v. Barr*.

59. Therefore, because Mr. ███████'s presence in the United States since his inspection and release in June of 2023 – following service of his Notice to Appear – has been under to § 1226, the interpretation applied by Respondents is unlawful. Both the BIA's jurisdictional determination and Mr. ███████'s continued detention, absent a hearing to determine whether he poses a danger to persons or property or is likely to appear for future proceedings, are contrary to the laws of the United States.

**COUNT TWO**

**Violation of Fifth Amendment Protections and Right to Due Process**

60. Mr. ▮▮▮▮▮'s detention by DHS violates his rights under the Due Process Clause of the Fifth Amendment to the United States Constitution. The allegations in the above paragraphs are realleged and incorporated herein. Immigration detention violates due process if it is not reasonably related to the purpose of ensuring a noncitizen's removal from the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 690-92, 699-700 (2001); *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Where removal is not reasonably foreseeable, detention cannot be reasonably related to the purpose of effectuating removal and is unlawful. *See id*. at 699-700.

61. The Supreme Court has also established the principle that noncitizens in deportation or removal proceedings are just as entitled to due process protections as anyone else. *See Zadvydas*, 533 U.S. at 690 (2001) ("A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any "person . . . of . . . liberty . . . without due process of law.'")

62. In *Jennings v. Rodriguez,* the Supreme Court made a clear distinction between noncitizens who are detained while entering the country and noncitizens who are already present in the United States. 583 U.S. at 287. The opinion of the Supreme Court recognizes that **"§ 1226 applies to aliens already present in the United States. . . ." and that "§ 1226(a) authorizes the Attorney General to arrest and detain an alien 'pending a decision on whether the alien is to be removed from the United States.'"** *Id*. (emphasis added). As long as the detained alien is not covered by § 1226(c), the Attorney General "may release" the alien on "bond . . . or conditional parole." § 1226(a). Furthermore, federal regulations provide that aliens detained

under § 1226(a) receive bond hearings at the outset of detention. *See* 8 CFR §§ 236.1(d)(1), 1003.19.

63. The interpretation that DOJ and DHS are currently using is in egregious violation of the constitutional protection set in the Due Process clause, as it allows the government to detain noncitizens without providing any recourse for them to question their detention, and more importantly, does not provide any obligation for the government to justify such detention. The ultimate question is whether noncitizens who have resided in the United States for several years are entitled to fundamental due process protections, including a hearing before an independent adjudicator to determine the lawfulness of their detention. As supported in this brief, the legal analysis unquestionably supports the conclusion that they are entitled to such rights. Beyond the technical legal analysis, however, it is also a matter of basic fairness and common sense: all individuals, regardless of immigration status, are entitled to fundamental protections of liberty.

> Were it true that "arriving" noncitizens have no due process rights, it would mean that such individuals – including those living freely among us on parole – could "be subjected to the punishment of hard labor without a judicial trial." *Clerveaux v. Searls*, 397 F. Supp. 3d 299, 316 (W.D.N.Y. 2019) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 704 (2001) (Scalia, J., dissenting)). "And it would mean that a noncitizen living here on parole could be taken into custody and beaten by local police without any violation of the Fourth Amendment. That cannot be the law." *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493 at *16 (W.D.N.Y. July 16, 2025).

64. The Due Process Clause protection to noncitizens has long been supported by the Supreme Court, indicating that noncitizens have fewer protections in their ***initial entry,*** but have full protections of the Due Process Clause once they are already in the United States. *See*

21

*Department of Homeland Security v. Thuraissigiam,* 591 U.S. 103 (2020); *see also Landon v. Plasencia,* 459 U.S. 21, 32 (1982). In *Thuraissigiam*, the Court reinforces the limited protections for individuals seeking initial entry to the United States. *See Thuraissigiam*, 591 U.S. at 107. (emphasis added). But they create a clear distinction between noncitizens who are trying to enter the country from those who have already entered the country and have established ties to the U.S. *Id*. The Court concludes that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'... For due process purposes, he stands on the threshold of initial entry, and his constitutional rights are limited accordingly." *Id*. at 139-140. The Supreme Court in *Thuraissigiam* reaffirmed *Landon v. Plasencia* and *Zadvydas* stating that "while aliens who have established connections in this country have due process rights in deportation proceedings," the same is not true for an alien at the threshold of initial entry. *Id*. at 107.

65. Therefore, there is no question that the Supreme Court has long recognized a ***distinction*** between those who are arrested at the border trying to enter the country and those arrested while in the country. Respondents' interpretation ignores the well-established "distinction between an alien who has effected an entry into the United States and one who has never entered [that] runs throughout immigration law." *Zadvydas v. Davis,* 533 U.S. 678, 693 (2001). "[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.*

66. Even in *Thuraissigiam*, the Supreme Cout reinforced the limited protections for individuals seeking initial entry to the United States, but it creates a clear distinction between noncitizens

who are trying to enter the country from those who have already entered the country and established ties to the U.S. *DHS v. Thuraissigiam*, 591 U.S. 104, 114 (2020). The Supreme Court concludes that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry'... For due process purposes, he stands on the threshold of initial entry, and his constitutional rights are limited accordingly." *Id* at 114. However, for individuals already in the United States, the Court in *Thuraissigiam* reaffirmed *Landon v. Plasencia, 459 U.S. 21, 32 (1982)* and *Zadvydas*, stating that "while aliens who have established connections in this country have due process rights in deportation proceedings, the same is not true for an alien at the threshold of initial entry" *Id.* at 113.

67. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas* at 690. Being free from physical detention is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) "[W]hile [DHS] might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process." *Ceesay v. Kurzdorfer,* No. 25-CV-267, 2025 WL 1284720, at *1 (W.D.N.Y. May 2, 2025). Also, "there is something fundamentally unfair about the government's changing the rules by fiat simply because it wants to. That is arbitrary by definition." *Mata Velasquez*, 2025 WL 1953796 at *6. "Luring noncitizens here, paroling them for a period of time, and then telling them 'never mind' is just plain wrong—made even worse when the noncitizens are detained while their cases are heard. And a change in administration does not justify or excuse such fundamental unfairness." *Id.* at *25 n.6.

68. A basic principle—that individuals placed at liberty are entitled to due process before the government again imprisons them—has particular relevance here, where Mr. ███████'s detention was previously found to be unnecessary to serve any purpose. Mr. ██████ was not detained while crossing the border, but while living in the United States and waiting to receive lawful status as a special immigrant juvenile. He has committed no crime, and his release from custody in 2023 provided him with a protected liberty interest. The government may not unilaterally take away his liberty.

## COUNT THREE

### Violation of Fourth Amendment Right to Protection from Unreasonable Searches and Seizures by the Government

69. In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574 (1975), the Supreme Court sought to determine what standard of proof, if any, an immigration officer must apply to stop and detain individuals to investigate their immigration status. *See* 422 U.S. at 880–82, 95 S.Ct. 2574. The Court stated that, just as in the criminal context, an immigration officer "must have a reasonable suspicion" to justify briefly stopping individuals to question them "about their citizenship and immigration status...but any further detention...*must be based on ... probable cause.*" *Id.* at 881–82, 95 S.Ct. 2574 (emphasis added) (citing *Terry v. Ohio,* 392 U.S. 1, at 29, 88 S.Ct. 1868); *see also id.* at 884 ("[T]he Fourth Amendment ...forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

70. The First Circuit has required that immigration officers have reasonable suspicion to briefly stop individuals to question them regarding their immigration status and probable cause for any further arrest and detention. See, e.g., *United States v. Mendez–de Jesús*, 85 F.3d 1, 3 (1st

Cir. 1996) (recognizing that *Brignoni–Ponce* stands for "the principle that an individual may not be [briefly] detained for questioning about citizenship absent reasonable suspicion that the person is an illegal alien"); *Lopez v. Garriga*, 917 F.2d 63, 69 (1st Cir. 1990) (noting that detention to inquire about an individual's immigration status is "a seizure and implicate[s] the Fourth Amendment" (citing *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216–17, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968)))); *Navia–Duran v. Immigration & Naturalization Serv.*, 568 F.2d 803, 809 n.7 (1st Cir. 1977) (recognizing that an immigration arrest and detention must be "supported by probable cause or reasonable suspicion").

71. Statutory authority for warrantless enforcement actions is provided in 8 U.S.C. § 1357. Under 8 U.S.C. § 1357(a)(2), ICE officers may conduct warrantless arrests if there is "reason to believe" that the potential arrestee (1) "is in the United States in violation of [an immigration] law or regulation" and (2) "**is likely to escape before a warrant can be obtained for his arrest**." *Nava v. Dep't of Homeland Sec.*, 435 F.Supp.3d 880, 885 (N.D. Ill. 2020) (emphasis added). Mere presence within the United States in violation of U.S. immigration law is not, by itself, sufficient to conclude that an alien is likely to escape before a warrant for arrest can be obtained. *Id.*

72. Here, Mr. ███████ was stopped by the Troy Police Department for allegedly speeding. The Troy Police signed an agreement with ICE to participate in the 287(g) program, which supposedly allows law enforcement to exercise immigration enforcement authority during routine police duties. After his stop, the Troy Police officers contacted a Deportation Officer ("DO") from the ICE ERO sub office, who "ran checks on [Mr. ███████]". According to the

information provided by ICE, "Records checks were negative for any legal entry into the United States, or any lawful status in the United States. DO Schawrtz informed Troy Police they were good to arrest [Mr. ████████] under their 287g authority." Mr. ████████ was then transferred to ICE ERO office in Manchester, NH, for processing, and arrested without a warrant because, according to the police, "he was likely to abscond" as "[he] was in a vehicle that could drive anywhere at the time of his arrest." *See* Ex. 2-3.

73. There is nothing to indicate that the Troy police department had any reason to detain the Petitioner based on any traffic or criminal violation. Here, the documents provided by ICE indicate that Petitioner was stopped for "speeding," which is a civil violation in the state of New Hampshire. N.H. Rev. Stat. Ann. § 265:60 (2025). Later, however, they inquired about Petitioner's status and then detained him because a deportation officer *told* the police officers to detain the Petitioner. The only determination made regarding whether Petitioner could have escaped before a warrant could be obtained is a statement that the Petitioner "was arrested without a warrant because he is likely to abscond. He was in a vehicle that could drive anywhere at the time of his arrest." *See* Ex. 2-3.

74. First, ICE does not have the power to give local law enforcement agencies, such as the Troy Police Department, powers that ICE itself does not have. Here, the documents provided by ICE indicate that Petitioner was stopped for "speeding," which is a civil violation in the state of New Hampshire. N.H. Rev. Stat. Ann. § 265:60 (2025). The report of his arrest provided by ICE has several incongruencies, including that they ignore Petitioner's approved I-360 petition by USCIS, and the deferred action that he had until he was detained.

75. The record of the interaction also indicates that Petitioner handed his "employment authorization card" when asked for identification. The employment authorization card is produced by U.S. Citizenship and Immigration Services ("USCIS") only for those individuals who are eligible to receive it, including those who have deferred action. A deferred action authorizes an individual to remain in the United States, and the employment authorization card shows the exact category for which the card was given to the person. In the Petitioner's case, the card had the category "C14" which is the category for those who have deferred action. Thus, there were reasons to believe that Petitioner had lawful presence in the United States and therefore should not be detained.

76. However, DHS ignored those circumstances, and with very limited information regarding Petitioner's status or situation, and without a true assessment of whether Petitioner was a danger to the community or a flight risk, determined that the Troy Police Department should detain the Petitioner without a warrant.

77. The mere fact that Mr. ███████ was in a vehicle does not provide a lawful basis for his arrest without a warrant. In *United States v. Brignoni–Ponce*, 422 U.S. 873 (1975), the Supreme Court held that immigration officers must have reasonable suspicion to stop and question individuals about their immigration status. Any further detention requires probable cause. The Court emphasized that the Fourth Amendment forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.

78. Similarly, in *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015), the First Circuit ruled that an immigration detainer constitutes a new arrest under the Fourth Amendment and must be supported by probable cause of the individual's removability. The court noted that detention

27

authorized by an immigration detainer requires more than just reasonable suspicion, as prolonged detention falls well on the arrest side of the divide.

79. Furthermore, the Supreme Court has held that the Fourth Amendment's protections against unreasonable searches and seizures apply to all individuals, regardless of their immigration status. In *Arizona v. United States*, 567 U.S. 387 (2012), the Court emphasized that states cannot enact policies that undermine federal authority over immigration enforcement. In that case, the Supreme Court stated that:

> [A]s a general rule, it is not a crime for a removable alien to remain in the United States. The federal scheme instructs when it is appropriate to arrest an alien during the removal process. The Attorney General in some circumstances will issue a warrant for trained federal immigration officers to execute. If no federal warrant has been issued, these officers have more limited authority. They may arrest an alien for being "in the United States in violation of any [immigration] law or regulation," for example, but only where the alien "is likely to escape before a warrant can be obtained. § 1357(a)(2)."
>
> Section 6 attempts to provide state officers with even greater arrest authority, which they could exercise with no instruction from the Federal Government. This is not the system Congress created.
>
> **Federal law specifies limited circumstances in which state officers may perform an immigration officer's functions. This includes instances where the Attorney General has granted that authority in a formal agreement with a state or local government**. See, *e.g.,* §1357(g)(1). Although federal law permits state officers to "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," §1357(g)(10)(B), this does not encompass the unilateral decision to detain authorized by §6. Pp. 15–19.
>
> *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (emphasis added).

80. Therefore, the warrantless arrest of Mr. ██████ was unconstitutional. The mere presence of an individual in a vehicle does not justify an arrest without probable cause. Additionally, the 287(g) program does not authorize local law enforcement to detain individuals without a

warrant. The actions taken by the Troy Police Department, based solely on an ICE officer's instruction, violated Mr. ██████'s Fourth Amendment rights.

### **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)   Assume jurisdiction over this matter.

(2)   Issue an Order to Show Cause, pursuant to 28 U.S.C. § 2243, ordering Respondents to show cause why the Petition should not be granted within three days.

(3)   Declare that Petitioner's detention violates the Due Process Clause of the Fifth Amendment, the Fourth Amendment, and federal law.

(4)   Issue a Restraining Order preventing Petitioner from being transferred out of the state of New Hampshire for the duration of these proceedings.

(5)   Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately.

(6)   Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under law; and

(7)   Grant any further relief this Court deems just and proper.


Date: October 24, 2025                                    Respectfully submitted,


                                                          ███████████████
                                                          ██████████████, Esq.
                                                          Bar No. ██████ (*pro hac vice forthcoming*)
                                                          Celedon Law PC
                                                          277 Main Street, Ste 305
                                                          Marlborough, MA 01752
                                                          Phone: (508) 573-3170
                                                          Email: ████████████████
                                                          *Attorney for Petitioner*

29

███████████████████
███████████ Esq.
*Counsel for Petitioner*
Bar No. ██████
Celedon Law PC
277 Main Street, Ste 305
Marlborough, MA 01752
508-573-3170
█████████████████

Dated: October 24, 2025

## CERTIFICATE OF SERVICE

I, ██████████, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF), and paper copies will be sent to those indicated as non-registered participants.

Dated: October 24, 2025



, Esq.

, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

████████████████████

V.                                                              Case no. ████████████

STRAFFORD COUNTY DEPARTMENT OF
CORRECTIONS, SUPERINTENDENT, ET AL.

ORDER

In their "Abbreviated Response to Habeas Petition and Request to Proceed Without
Additional Briefing or Argument," (doc. no. 3), respondents agree that this court's analysis
in Jimenez and Lamidi controls the result in this case. See Jimenez v. FCI Berlin, Warden, ---
F. Supp. 3d ----, 2025 WL 2639390 (D.N.H. Sept. 8, 2025); Lamidi v. FCI Berlin, Warden, Civ.
No. 25-cv-297-LM-TSM (D.N.H. Sept. 15, 2025) (doc. no. 14). Seeing no reason to depart from
that analysis, the court concludes that petitioner is eligible for a bond hearing under 8 U.S.C.
1226(a) and its implementing regulations, such that petitioner's present detention without
a bond hearing violates the INA. The petition for a writ of habeas corpus (doc. no. 1) is
therefore granted as to Count I.

Respondents are ORDERED to provide petitioner with a bond hearing before an IJ
pursuant to 1226(a) at which the IJ shall have the authority to order petitioner's release on
bond. This hearing shall occur within seven (7) days. On or before November 6, 2025,
respondents shall file a status report in this court describing the result of that hearing.

Landya B. McCafferty
Chief Judge

Date:     October 29, 2025